154 So.2d 439 (1963)
Lynn KILPATRICK, Plaintiff-Appellant,
v.
STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS, Defendant-Appellant.
No. 9954.
Court of Appeal of Louisiana, Second Circuit.
May 21, 1963.
Rehearing Denied June 20, 1963.
*440 D. Ross Banister, Philip K. Jones, Norman L. Sisson, George W. Lester, William J. Doran, Jr., Thomas A. Warner, Jr., Baton Rouge, for defendant-appellant.
Robert E. Eatman, Shreveport, for plaintiff-appellant.
Before HARDY, AYRES and BOLIN, JJ.
AYRES, Judge.
By authorization of a joint resolution of the Legislature, plaintiff instituted this action against the State of Louisiana, through the Department of Highways, to recover property damages, hospital and medical expenses, loss of wages, and damage for personal injuries sustained in an accident on State Highway 155 at a bridge crossing Saline Creek. The accident occurred during the night of December 8, 1960.
From a judgment in plaintiff's favor, for $7,142.62, which included, among other items, $2,500.00 for pain and suffering and $3,600.00 for loss of wages, both plaintiff and defendant have appealed. Plaintiff complains of the inadequacy of the awards for the designated items. Defendant's principal complaint is directed to the issue of liability.
Negligence charged to the Department of Highways consists of the presence of a mound of earth at the end of an unfinished bridge, to which, from the surface of the roadway, was a drop estimated to be from 6-12 inches, unguarded and unprotected. The bridge in question, located between Saline and Friendship, about 800 feet in length, was being reconstructed. In fact, the project was approaching a stage of completion. The foundation had been replaced, the floor decking, of heavy creosoted timbers, had been laid; posts for the banisters had been placed in position but apparently were not braced; the flooring was ready for the subsurface materials and the application of asphalt which would serve, among other purposes, to bring the level of the surface of the bridge to that of the roadway. At each end of the bridge was a space approximately two feet in width extending across the highway, located between the finished highway and the abutments of the bridge. This space, of an undisclosed depth, had been filled with dirt.
While the bridge was in the aforesaid uncompleted stage, the highway crew, due to an emergency elsewhere, was called away from this project for approximately six weeks. In the meantime, the movement of traffic across the bridge shifted the dirt at the bridge abutments, piling some upon the roadway and other upon the bridge itself. Thus, the slope to the bridge was changed and the spaces at the ends of the bridge were deepened. The crew, however, returned to its work on this bridge the morning of the day of the accident. Work was resumed with reference to the erection of the banisters, or railings, and the removal of the dirt from the surface of the bridge.
Plaintiff was the lessee of a Diamond "T" truck, 12 feet in length, equipped with single wheels on the front and dual wheels on the rear, and designed for pulling a trailer. To the truck was attached a Lufkin tandem semitrailer owned by Ronald A. Patterson. The unit, truck and trailer, had an overall length of 32 feet and was loaded with lumber having a weight of approximately 55,000 pounds, a shipment en route from Danville, Louisiana, to San Antonio, Texas.
As plaintiff approached the bridge with his truck and trailer, he came around a curve to the right and, after descending a hill, struck the mound of dirt on the roadway and dropped to the decking of the bridge. He lost control of his vehicle, which continued a distance of 406 feet, when it jackknifed. The truck left the bridge and dropped a distance of six feet, three inches to the ground. The rear of the truck and the trailer were suspended from the bridge. The occasion was plaintiff's first trip over this particular highway.
*441 A review of other evidence in detail, on the question of fault and liability, would serve no useful purpose. It suffices to point out that the record leaves no doubt there were no barricades or other devices guarding the bridge; nor were there any signs, lights, flares, or other contraptions warning the public of the condition of the bridge and its approaches. The condition constituted an obstruction and danger to the traveling public. A superintendent over the highways in this area, as a witness for defendant, very properly and correctly conceded that the danger warranted the use of flares. In fact, the evidence shows that flares had, at one time, been used and displayed at this location, but, inasmuch as they were destroyed through the marksmanship of parties unknown while probably engaged in target practice, their use was never resumed.
There is a mandatory, statutory duty of the Department of Highways to erect and maintain adequate signs, signals, and devices to inform, direct, caution, and warn the traveling public of any unsual situation or dangerous condition on the highways which may impede, obstruct, or endanger the safety of traffic.
LSA-R.S. 48:345, in part, reads as follows:
"The department shall erect and maintain all signs, signals, or devices necessary for informing, directing, cautioning, and warning the traveling public."
The mound of dirt across the highway and the drop from the highway surface to the deck of the bridge constitute such obvious and serious obstructions and dangers as are contemplated by the statute.
The duty imposed upon a state or its department of highways or other appropriate authority is to construct and maintain highways which are reasonably safe for public travel. In the performance of this duty, the character of the road and the probable traffic must be kept in view, as the requirement of reasonable safety implies safety for the general or ordinary travel, or use for any lawful or proper purpose. Preuett v. State through Department of Highways, La.App. 2d Cir., 1953, 62 So.2d 686; Rosier v. State, La.App. 2d Cir., 1951, 50 So.2d 31; DeHart v. State, La.App. 1st Cir., 1950, 46 So.2d 366; 40 C.J.S. verbo Highways § 254 b, p. 293.
The general rule is also well established and recognized in the jurisprudence that a motorist using a public highway has a right to presume, and to act upon the presumption, that the highway is safe for usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments, or obstructions to which his attention has not been directed and of which he has not been warned. Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A.1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1; Reeves v. State, La.App. 2d Cir., 1955, 80 So.2d 206 (affirmed, 232 La. 116, 94 So.2d 1); Dowden v. State, La.App. 2d Cir., 1955, 81 So.2d 48; 5A Blashfield's Cyclopedia of Automobile Law and Practice, p. 387, verbo "Highways," § 3320.
From a resume of the facts of the cases cited, and from pronouncements of the legal principles involved, viewed in the light of the statutory duties and obligations of the highway authorities, there is no doubt of the negligence of the defendant and its employees in their failure to provide adequate barricades to protect and adequate signals or devices to warn motorists of the aforesaid dangerous conditions existing at the scene of the accident in which plaintiff sustained injuries.
The conclusion is, therefore, inescapable that the aforesaid conditions constituted obstructions on the highway endangering the safety of the public, who should have been warned by appropriate and adequate signs and flares. The failure of the Department to afford such protection or to furnish appropriate *442 warnings was the sole and proximate cause of plaintiff's losing control of his vehicle.
Lastly for consideration is the question of the sufficiency of the award to compensate plaintiff for his injuries and for the loss of wages. Following the accident, plaintiff returned to his home in Shreveport. The next morning he consulted his family physician and surgeon, Dr. George G. Garrett, who, after examination, found plaintiff suffering from a sacroiliac strain. Plaintiff's back was strapped and the use of a belt was later recommended; he was administered medication and physiotherapy for the relief of muscular spasm and pain over a period of several weeks while under the medical care of Dr. Garrett.
Upon plaintiff's continued complaints of pain, Dr. Garrett referred plaintiff to Dr. D. F. Overdyke, Jr., an orthopedist. Upon examination, Dr. Overdyke found that plaintiff had sustained a lumbosacral strain and was of the opinion that he had also sustained a pedicle fracture of a lumbar vertebra. Plaintiff was fitted with a brace. The doctor was of the opinion, in May, 1961, that plaintiff would reach the maximum improvement within an additional period of four months. There would, in his opinion, remain a residual, permanent disability of 15 percent of the body as a whole.
Plaintiff, without employment until March 24, 1961, was examined by Dr. C. H. Potts for employment with another employer. Dr. Potts found plaintiff was suffering from no disability and testified that plaintiff disclosed no information as to a prior injury.
Under date of October 31, 1961, plaintiff was examined on behalf of the defendant by Dr. Carson R. Reed, Jr., an orthopedist. His examination revealed no fracture of the pedicle of the fifth lumbar vertebra; nor did it disclose any objective symptoms for a continuation of pain or any abnormality. An examination on behalf of the defendant was also made by Dr. Tom J. Smith, a physician and surgeon, September 12, 1961. X-rays of the pelvis and lower back were negative and disclosed no indication of a fracture, either old or recent, in those areas.
The record discloses that plaintiff was involved in a second accident on August 4, 1961, while engaged in other employment with which this defendant is not concerned. Dr. Overdyke reported that, while examining and treating him for the subsequent injury, plaintiff related his improvement from the first injury had been very satisfactory, although at times he had to shorten his workday and that his work was a little slower than usual. The doctor's diagnosis of the second injury was a recurrent sprain of the lumbar spine. Nevertheless, the opinion was adhered to that plaintiff had sustained, from the first accident, permanent disability of 15 percent to the body as a whole.
No doubt plaintiff received injuries when the cab of his unit was thrown from the bridge and fell to the ground. That the accident was sufficient to produce serious injuries is unquestioned. The evidence, however, warrants a finding that plaintiff was not as seriously injured as he claims. The trial court obviously took into consideration all the pertinent facts and circumstances in fixing the award. From our review of the record, we fail to find any manifest error in his conclusions. The award, in our opinion, is not inadequate.
Plaintiff's complaint as to the allowance made for loss of wages is predicated upon a longer period of disability than that allowed. No complaint is made as to the rate of the loss. This item was calculated on a loss of wages at the rate of $200.00 per week over a period of 12 weeks and for a partial loss of earnings at the rate of $100.00 per week for 12 weeks. We find no basis for disagreement.
For the reasons assigned, the judgment appealed is affirmed, with costs such as are taxable against the defendant.
Affirmed.