403 So.2d 118 (1981)
Michael SWANSON
v.
The ESTATE OF Arthur AUGUSTA, Central Mutual Insurance Company, and the State of Louisiana.
No. 12292.
Court of Appeal of Louisiana, Fourth Circuit.
July 30, 1981.
Rehearing Denied September 17, 1981.
Martzell, Montero & Lamothe, John R. Martzell and Harold M. Wheelahan, III, Harry C. Graham, III, New Orleans, for plaintiff-appellee.
Philip K. Jones, Norman L. Sisson, Marshall W. Wroten, Jesse S. Guillot, New Orleans, for Louisiana Dept. of Transp. and Development, defendant-appellant.
Before GULOTTA, GARRISON and CHEHARDY, JJ.
CHEHARDY, Judge.
The State of Louisiana, Department of Transportation and Development (formerly *119 The Department of Highways), appeals a district court decision in favor of plaintiff, Michael Swanson, and against that defendant, in the sum of $510,659 together with legal interest from the date of judicial demand until paid and all costs of the proceedings. The court also found the State was negligent and therefore liable to the plaintiff for damages suffered by him as a result of the accident in which he was involved.
The plaintiff has answered the defendant's appeal asking that the judgment of the district court be increased to $1,500,000 but that the judgment be affirmed in all other respects. In his argument, plaintiff has suggested an increase to $1,581,105.27.
In an amended judgment the district court also held that, in addition to the liability of the State, Arthur Augusta, pursuant to the stipulation of all parties, was negligent in his operation of the motorcycle in question and, therefore, the court found his estate also liable to the plaintiff for damages he suffered as a result of the accident. The court also held that, again, pursuant to the stipulation of all parties, Central Mutual Insurance Company, as liability insurer of Arthur Augusta, was liable to the plaintiff in the amount of $5,000. The judgment thereafter cast the defendants State of Louisiana and the Estate of Arthur Augusta in judgment in favor of the plaintiff, in solido, in the full sum of $510,659 together with legal interest from the date of judicial demand until paid and for all costs of the proceedings. The court further rendered judgment in favor of the plaintiff and against the defendant Central Mutual Insurance Company in the full sum of $5,000.
In his written reasons for judgment, the district court judge stated:
"Counsel for the State of Louisiana Department of Transportation and Development relied heavily on a defense that the operator of the motorcycle was grossly negligent because he allegedly had been `drinking beer for several hours prior to the accident'. This Court might have reached the same conclusion except that the legally admissible evidence did not support such a defense to the plaintiff's cause of action. The Court carefully considered the testimony of Mrs. Jacquelyn Lupo who happened to be travelling on the expressway leading to the site of the accident shortly prior to the unfortunate incident. Whereas she did state that the motorcycle changed lanes on more than one occasion she did not indicate at anytime that the operator was not in control of the motorcycle. On the contrary, she acknowledged that both the operator and the passenger (plaintiff) appeared to be `flirting with her' and the she responded, although passively, to the flirtation. But she further testified that these actions (characterized as `clear irresponsibility' and `inability to handle the motor bike' by counsel for defendant) took place at a considerable distance from the accident site.
"In further support of the defense of intoxication, Counsel for the State attempted to have an expert testify regarding the alcohol content of the body of the operator who was found dead at the scene of the accident. This Court concluded that the witness called to testify could do so only on the basis of inadmissible evidence. But even if this Court had permitted such testimony to be elicited, after hearing other experts regarding other aspects of the case, this Court is convinced that the intoxication of the operator of the motorcycle, if he was in fact intoxicated, was not the proximate cause of the injuries suffered by the plaintiff.
"Whereas other aspects of the evidence consumed most of the time spent hearing this cause, the most important evidence in support of the plaintiff's claim came when the Court became privy to the sketches of Trooper Netterville and the cogent testimony which led the Court to a rational reconstruction of the accident and the exact point of impact of the motorcycle and the guard-rail.
"The condition of the guard-rail at the point of impact was most compelling. It is undisputed that several feet of the permanent railing had been destroyed as *120 a result of a prior accident. The La. Department of Highways made temporary repairs to the damaged area. It is admitted by all of the experts that guard-rails, such as the one at this location, are designed to propel a vehicle back into the roadway when impacted by any vehicle leaving the roadway. However, the testimony adduced at trial shows that the repairmen at the time of making repairs to this site, installed large iron plates or beams perpendicular to the roadway. It is more probable than not (supported by expert testimony) that the plates or beams caused the motorcycle to come to a sudden stop and the bodies of the victims were propelled like trajectories almost seventy-eight feet to the ground below. This was the negligence of the Louisiana Department of Transportation and Development and this Court finds nothing in the record that relieves it of its liability to the plaintiff.
"This Court is very much concerned that the Louisiana Department of Transportation and Development has apparently failed to recognize that this portion of the highway system is fraught with danger. In this Court's view, for example, it is inexcusable that the Department would so callously remove the barrier divider at this location because certain (extraordinarily) large tractor trailers are not able to negotiate the curved area without striking the barrier. Even if one ignores the expert testimony of Engineer Robert Lipp, there is overwhelming support for the conclusion that this accident occurred at a dangerous curve in the roadway, be it `highway', `expressway' or `approachway'. It is admitted, even by the defendant, that this portion of the road does not meet today's `highway design standards'. BUT when one ADDS another factori. e., the improper temporary repairs to the guard-rail ... the motorist is confronted with a condition that put the plaintiff in peril not connected with or related to the actions of the host motorcycle operator, who died in this accident.
"This Court itemizes the damages suffered by plaintiff as follows:

Medical Expenses (already accrued) $ 23,659.00
Needed Psychiatric Treatment 25,000.00
Future Bladder Surgery 2,000.00
Pain, Suffering, Inconvenience, Embarrassment,
Loss of Sexual Capabilities,
etc. up to time of trial 100,000.00
Loss of Income for at least thirty (30)
years 90,000.00
Pain and Suffering and Physical impairment
at $500.00 per month for forty-five
(45) years 270,000.00
 ___________
 TOTAL: $510,659.00

1The Court places a minimum valuation on the loss of wages of plaintiff since this Court believes it is very likely that he will learn to perform meaningful work as soon as his physical and mental condition are stable.
2The Court notes that the life expectancy of a white male in 1978 was 69 years."
The plaintiff was injured on the morning of April 2, 1978, at approximately 6:10, as he was riding on the back of a motorcycle driven by Arthur Augusta. Although the plaintiff remembered nothing of the accident, it was evident from the testimony of others who arrived at the scene shortly after the accident, that the motorcycle crossed lanes on the elevated portion of a loop ramp of Causeway Boulevard, going toward Jefferson Highway, where it struck either a part of the curbing or a part of the railing, projecting the driver and passenger over the side of the guardrail.
The investigating officer of the accident, Louisiana State Police Trooper Alden B. Netterville, testified he found the body of Augusta 78½ feet from the base of the overpass, and he determined the point of impact was where the braces or make-shift braces were on the outside guard railing.
Trooper Netterville noted that at the point of impact the temporary metal guard railing was defective, that it was "leaning out" and did nothing to restrain anyone who might be thrown against the the railing. He also stated it was darker than the rest of the railing making it more difficult to observe on approach. He added the roadway, due to a very slight mist, was a little bit slick on the morning of the accident.
*121 Lieutenant Lynn Bertaut, Jr., another State Trooper, testified he investigated a motorcycle accident at approximately the same location as that in the present case on March 28, 1978. He said the driver of the vehicle failed to negotiate the right hand turn and also went over the guardrail, which had been previously damaged. The trooper added that there was not a permanent structure there at the time and the majority of the street lights in the area were out. He said he had also investigated other accidents involving collisions with that particular guardrail.
James R. Fister, who was accepted by the court as an expert in highway safety design, traffic engineering and accident reconstruction, referred to a manual entitled "A Policy on Geometric Design on Rural Highways," published by the American Association of State Highway Officials, which was in effect at the time the subject highway was built, as well as the "as built" plans of the area of the highway involved in the present case, and also testified he had driven over the subject highway area. Fister characterized the accident site as an "interchange" and explained that it was deficient because it was a two-way roadway rather than one way; the degree of curvature was not according to standards; the rate of superelevation and superelevation runoff was deficient; the designed pavement width was not sufficient; the vertical control, or method in which a change in elevation is obtained, was not in accordance with suggested practices; it was signed improperly; the regulatory speed was incorrect; and the warning signs were not sufficient and were confusing to the driver. He also said a later manual recommended a median barrier also be placed on such areas as the one in the present case.
Fister explained the width of the loop should have been 32 feet whereas it was only 28 feet wide, distracting from the maneuverability of the driver. He added the sharp horizontal movement of the roadway coupled with the sharp vertical movement required much more attention from the driver, and the tendency of a vehicle was to go straight rather than make the turn, much as the cycle did in the present case. He described the situation as hazardous.
In continuance of his testimony, Fister added that the design speed of a roadway such as this one is 20.3 miles per hour but that the posted speed should be lower than the design speed. He noted that on the subject curve there was a 25-mile-per-hour posted speed limit, and the 20-mile-per-hour sign was not an actual speed limit sign.
Fister also reviewed work orders of the State stating that on February 10, 1978 the guardrail was repaired and some further work, without materials, was done on February 23, 1978, but no other repairs were made prior to the April 2, 1978 accident. He characterized this as an extreme amount of delay in such a serious situation. He also said the guardrail was sticking out over the structure allowing itself to project anything that hit it off the ramp rather than being contained within.
This expert also estimated the speed of the cycle as between 33 and 39 miles per hour as it hit the guardrail, and added that, assuming that particular speed, the design characteristics were responsible for the accident because the driver was assuming the roadway continued and was not physically warned or brought into the reality of what he was going to encounter.
Fister also testified, according to accident records, that there were 13 accidents at the site in 1978, and 65 to 70 percent had crossed over the median and hit the barrier in the opposite lane, as in the present case. For 1977, the records revealed 14 accidents in approximately the same area; but six of the drivers had been drinking and six had been exceeding the speed limit. In 1976, he noted, there were eight accidents involving 15 drivers, only one of which had been drinking and only three of which had been exceeding the posted 25-mile-per-hour speed limit. Fister explicitly stated the design deficiencies of the loop and absence of a median barrier had no relationship to the condition of the driver.
Dr. Olin K. Dart, a civil engineer who works primarily in the field of highway and *122 traffic engineering and analysis of traffic accidents, testified he had reviewed the scene of the accident, the police report and the "as built" plans of the site and said the minimum design standards in effect at the time the loop was designed were met by the facility. He also stated that although there was a roll curb in place as a lane divider on part of the loop, at points it had been broken out by traffic impacting it and had not been replaced. His opinion was that the primary cause of the accident was the excessive speed of the motorcycle, and he did not think the rail had anything to do with it.
Don L. Ivey, a civil engineer and highway safety researcher, stated the degree of curvature and superelevation of the loop met the minimum standards in effect at the time of construction and that the superelevation runoff is better than the minimum standards. He said the design speed of 20 miles per hour was appropriate for the interchange and estimated the speed of the cycle on impact at 40 to 45 miles per hour. He felt the signing of the intersection was reasonable and his opinion was that excessive speed and reckless driving was the cause of the accident.
Geometric design engineer Patsy Miller and traffic operations engineer Boyd L. Gautreaux, employees of the Department of Transportation and Development, both felt the subject loop met design standards as of the date of its construction. Gautreaux, however, admitted that in 1971 and 1973 there were recommendations to repair the median curb barrier in the general area of this accident. He also stated that in April of 1976 a request was made by him for a study to make the structure one way, but he indicated in the report that should only be done as a last resort and other measures exhausted first to reduce the serious accidents. He said that after the subject accident he recommended the speed limit at the site be reduced to 20 miles per hour and that an overhead blinking light be installed with a 180-degree loop sign on it. He also had advised that chevrons be placed on the curve of the ramp to guide drivers around it. He did not advise a substantial barrier, however, because he felt it would take away from the width necessary to accommodate tractor-trailer vehicles.
Sharon Olman testified that both Augusta and the plaintiff entered a bar where she worked at about midnight on the evening before the accident occurred and that they drank approximately three or four beers apiece before leaving the premises at 3:15 a. m. She said that upon leaving both men appeared sober and were not driving recklessly; she added that neither ever drank mixed drinks or was a heavy drinker.
Jacqueline Lupo testified that immediately prior to the accident, the subject men on the motorcycle were proceeding ahead of her on West Metairie toward Causeway Boulevard and that she was traveling at a speed of 40 to 45 miles per hour. She said she slowed down when she reached the ramp and lost sight of the bike so that she could not say how fast the vehicle was traveling at that point or at the time of impact.
During the time she was following the motorcycle, Lupo said the driver, on occasion, switched lanes and also swerved within the lane and that the driver and passenger attempted to get her attention. She also said she did not think the cycle was being driven as carefully as it could have been.
In Breaux v. Louisiana Dept. of Highways, 347 So.2d 1290 (La.App. 1st Cir. 1977), the court said at 1293:
"It is generally accepted that `the Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. The Department is liable for damages only when it is shown (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful *123 and ordinarily prudent driver, and (2) that the Department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it.' * * *"
In regard to the question of when constructive knowledge of a dangerous condition exists, the court said in Gayle v. Department of Highways, 205 So.2d 775, 780-781 (La.App. 1st Cir. 1967):
"One is presumed to have constructive notice of a defect or dangerous condition when it is shown to have existed for such a long period of time that knowledge thereof can be presumed, or that it can be said that one ought to have had knowledge of the condition."
This court also noted in the recent case of Besnard v. Department of Highways, 381 So.2d 1303 (La.App. 4th Cir. 1980), at 1308:
"The decision of whether a condition of a highway actually is a dangerous and hazardous one to an ordinary prudent driver is a factual one, and the court should consider physical aspects of the roadway, frequency of accidents at that place in the highway and testimony of expert witnesses in arriving at this factual determination."
The case of Rue v. State, Department of Highways, 372 So.2d 1197, 1199 (La.1979), is also noteworthy for purposes of analysis of the present case:
"Under a simple `but-for' analysis the accident would not have occurred had either the Highway Department not been negligent in failing to maintain the shoulder or the plaintiff not been negligent (and for present purposes we assume her inadvertent meandering was negligence) in moving the vehicle onto the shoulder. But this does not conclude the inquiry. Focusing on plaintiff's `substandard' conduct the question is whether the risk of injury from striking an unexpected, negligently maintained highway shoulder was a risk reasonably related to plaintiff's failure to drive entirely on the paved portion of the highway. We conclude that it was not. A motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Conversely the Highway Department's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself travelling on, or partially on, the shoulder.
"We conclude that plaintiff's conduct if indeed it was substandard is no bar to her recovery of damages occasioned chiefly because the Highway Department negligently failed to maintain a safe highway shoulder. * * *"
It has also been held in U. S. F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976), at 785:
"* * * The general rule has been recognized in our jurisprudence that a motorist using a public highway has a right to presume, and to act upon the presumption, that the highway is safe for usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments, or obstructions, to which his attention has not been directed and of which he has not been warned. * * *"
Regarding the duty of the Highway Department in a case such as the present one, the court also said in U. S. F. & G. Co., supra, at 785:
"* * * In the performance of this duty, the character of the road and the probable traffic must be kept in view, as the requirement of reasonable safety implies reasonable safety for any lawful or proper purpose. Kilpatrick v. State, 154 So.2d 439 (La.App.2d Cir. 1963). In order to hold the Department of Highways liable for an accident caused by an unsafe or hazardous condition it must be shown that the Highway Department had prior notice, either actual or constructive, of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and warn motorists of its presence and failed to do so. Coleman v. Houp, 319 So.2d 831 (La.App.3d Cir. 1975)." (Emphasis ours.)
*124 This court is also aware that in Townsend v. State, Department of Highways, 322 So.2d 139 (La.1975), the court said at 141-142:
"It is well settled that the plaintiff has the burden of proving causation by a preponderance of the evidence. It is only necessary that the evidence show that it is more probable than not that the harm was caused by the tortious conduct of the defendant. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Perkins v. Texas & New Orleans Railroad Company, 243 La. 829, 147 So.2d 646 (1962). This burden of proof may be satisfied by direct or circumstantial evidence. Lombard v. Sewerage & Water Board of New Orleans, 284 So.2d 905 (La.1973); Jordan v. Travelers Insurance Company, supra; Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963). It suffices if the circumstantial evidence excludes other reasonable hypotheses only with a fair amount of certainty so that it is more probable than not that the harm was caused by the tortious conduct of the defendant. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972), on rehearing."
In the present case this court can find no error in the district court's determination that the State of Louisiana, Department of Transportation and Development, was responsible for the injuries of the plaintiff. In spite of some expert testimony to the contrary, and some testimony that the conduct of the driver of the motorcycle may have been somewhat substandard, we hold the plaintiff established it was more probable than not that the harm done to him was the result of a hazardous highway condition caused by improper signing of the site, deficient design (in relation to the standards in effect at the time of construction) and improper maintenance of the area (in regard to the railing and the median barrier) and that this condition, as borne out by accident statistics of the area, was hazardous to an ordinary prudent driver. We also find, due to the previous years' accident statistics in connection with the site, as well as the testimony of Gautreaux that the State had notice of the dangerous conditions existing on the loop and, although it had sufficient opportunity, before the present accident occurred, to correct these conditions or at least warn motorists of them through sufficient signing and lowered speed limits, it failed to do so. Accordingly, we find the trial court's holding that the State of Louisiana and the Estate of Arthur Augusta were in solido liable to the plaintiff was a proper determination.
Neither does this court find error in the district court's refusal to admit evidence in the form of a pathology report of a urine test which was offered to determine the alcoholic content in the urine from the body of Arthur Augusta. As noted by the trial court judge, the State failed to offer the proper foundation for the admission of that report due to the fact that the witness called to introduce the document could not assure the court that proper testing procedures had been followed, that the receptacles in which the specimens were placed had not been washed out with ethyl alcohol, nor that precautions were taken to make sure the specimen, once removed, had not become contaminated. Before any such test result can be admitted in any civil or criminal case, the party seeking to introduce such evidence must first lay a proper foundation for its admission by connecting the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. Pearce v. Gunter, 238 So.2d 534 (La.App.3d Cir. 1970).
This court will now address itself to the issue of quantum. In regard to the actual physical injuries of the plaintiff, Dr. Richard McCall, an orthopedist, tested that after the accident Swanson was admitted to the hospital with multiple injuries which included spinal fractures, resulting in paraplegia from the level of thoracic eight down.
Dr. McCall explained he would assume the paraplegia is permanent and that he *125 performed surgery on the plaintiff inserting a Harrington rod in order to stabilize the fracture of the spine. He did a bony fusion of the back by use of a graft taken from the plaintiff's right buttock. The physician said Swanson will be confined to a wheelchair, although such patients, with monumental effort, occasionally can ambulate using crutches and braces. He added that the plaintiff will be totally impaired and it will be difficult for him to support himself in an upright sitting position, requiring that he brace himself with his arms for balance.
Dr. William Brannon, a urologist, testified that although there was no major urologic injury per se to the plaintiff due to the accident, the injury to his spinal cord caused a paralysis of his bladder so that it does not empty nor completely retain urine. He said the injury also has caused paralysis of the rectal area and both of these conditions are permanent. He added the plaintiff must use a catheter and an external device, but recommended surgery on the urethra, which will render him totally incontinent, in order to eliminate the source of infection which previously required a hospital stay of ten days. He also stated such an injury as the plaintiff's frequently eliminates sexual response.
Dr. James Bruce Johnson, a plastic surgeon, testified the plaintiff developed ulcers on both of his hips due to being in bed following his injury, which situation caused the breakdown of skin and tissue. He said he operated to provide a soft tissue cover over the bone, taking a piece of skin and the rectus femoris muscle, and he added the operation lasted approximately three hours. He stated the plaintiff was treated elsewhere for the other ulcer.
Dr. John C. Bowen, III, also testified that subsequent to the accident he performed surgery on the plaintiff to explore his abdomen in order to arrest suspected bleeding in that area; however, other than superficial lacerations of the liver no significant injuries were found. He stated the plaintiff also had a hemothorax, or blood in the chest, after the accident which required insertion of a chest tube.
Dr. George Guild, a psychiatrist, said on examination of the plaintiff he found he was maintaining psychic equilibrium through denial to himself of what has happened to him. He said plaintiff is suffering from severe depression, resulting from his situation and that he has a great deal of anxiety about his future. He added Swanson has lost interest in life and that if he began therapy, and his denial system broke down, there would probably evolve a very profound depression. As treatment, therefore, he recommended an in-hospital stay lasting from four months to a year or a year and a half. He said the hospital rate was approximately $150 per day and the five to six sessions of therapy required per week would cost $65 to $75 per hour.
Dr. Judy Feldman, a clinical psychologist, confirmed Dr. Guild's diagnosis and recommendations for treatment through tests performed on the plaintiff and she also said his intelligence quotient was in the dull normal range.
Susan L. Smith, an occupational therapist and vocational evaluator, said, after testing the plaintiff, that he would have difficulty using his hands freely in any work because of his limited sitting balance which requires him to use his arms for support. She stated he would be unable to meet the physical demands of a general carpenter, the work he had been doing before the accident, and that he was not a candidate to return to a formal education program. Although she was not familiar with the job market in the New Orleans area, she noted that many paraplegics do re-enter the work field.
Seymore S. Goodman, accepted by the court as an expert in economics, testified a carpenter's helper would earn $4 an hour and a carpenter's apprentice would be making approximately $7 an hour at the time of trial. He estimated the plaintiff's lost wages up until the trial date to be $12, 170.42, based on the $4 per hour figure. He also estimated, based on the plaintiff's age and life expectancy, that his prospective earnings loss would be $399,975.85. On cross-examination he did note the plaintiff's actual earnings for the first three months *126 of 1978, the year of the accident, were only $777; however, he stated that December, January and February are slack months in the construction trades.
Perhaps the most convincing testimony of the pain, suffering, humiliation and incapacity the plaintiff sustains was presented in the form of a video tape of his daily activities as explained by his mother at the trial court and which also leaves no doubt that he is physically dependent on other members of his household in order to perform most of the basic, routine activities of daily life. In spite of this we feel the district court judge's award of $370,000 to Swanson for past and future pain and suffering was not an abuse of the much discretion he is allowed in setting these damages. As to that court's awards for medical expenses, psychiatric treatment and surgery, we also hold these amounts were in accord with the expert testimony presented on those issues. The award of $90,000 for loss of wages this court also feels is realistic in spite of the limitations the plaintiff will encounter upon re-entering the job market.
For the reasons assigned, therefore, the trial court judgment is affirmed.
AFFIRMED.