468 So.2d 675 (1985)
David Ray RICHARDSON, Plaintiff-Appellee,
v.
CONTINENTAL INSURANCE COMPANY et al., Defendants-Appellants.
No. 84-349.
Court of Appeal of Louisiana, Third Circuit.
April 10, 1985.
Rehearing Denied May 14, 1985.
*677 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette (Timothy J. McNamara, Lafayette), Mouton & Roy (Alan K. Breaud), Lafayette, for defendants-appellants.
R. Scott Ramsey, Berwick, Francis Dugas, Thibodaux, Leo J. Landry, Jr., Morgan City, for plaintiffs-appellants.
Clarence A. Frost, of Faris, Ellis, Cutrone & Gilmore, New Orleans, George R. Privat, Lafayette, for defendants-appellees.
Before GUIDRY, LABORDE and YELVERTON, JJ.
GUIDRY, Judge.
The above numbered and entitled matter was consolidated at the trial level and on appeal with the case of Kennerson v. Continental Insurance Company, et al, 468 So.2d 689 (La.App. 3rd Cir.1985). We will dispose of all issues presented in both cases in this opinion but render a separate decision in Kennerson, supra.
Both cases arise from the same vehicular accident in which an eighteen wheel tank truck ran a stop sign and collided with a carry-all van, in which five persons were riding. The defendants in both actions were the driver, the owner and the insurers of the eighteen wheeler. After a nine day trial, the jury found for the plaintiffs and awarded damages.
Defendants have appealed the judgments raising four issues:
1. Whether the trial court erred in refusing to admit into evidence the blood alcohol content reports of Smith Kline Clinical Laboratories, Inc., and Acadiana Medical Laboratories;

*678 2. Whether the trial court erred in refusing to qualify Mr. John Freeman as an expert in traffic engineering;
3. Whether the trial court erred in finding the State of Louisiana, through the Department of Transportation and Development, not liable for the plaintiffs' damages; and,
4. Whether the jury abused its discretion in rendering excessive awards in favor of the two plaintiffs.

FACTS
The accident occurred on February 16, 1982, at approximately 5:30 a.m. at the intersection of Louisiana Highways 35 and 335, just south of Kaplan, Louisiana. The weather conditions at the time of the accident were normal except for the presence of some dense, patchy fog in the area. A carry-all van, owned by Athena, Inc. (Athena) and being driven by William J. Kennerson, III, was traveling south on Highway 35. Four other Athena employees were riding in the carry-all. An eighteen wheel tank truck driven by Donald R. Royer and owned by Talen's Landing, Inc. (Talen's), was traveling west on Highway 335. Highway 35 is the favored highway and there were stop signs on Highway 335, at the intersection, in both east and west directions. The fact that Royer failed to stop in obedience to the stop sign at this intersection and was struck broadside by the oncoming Athena carry-all is uncontradicted. As a result of the collision, the tank truck was forced into a ditch and the carryall flipped over, coming to rest on its side.
The state police, ambulance and rescue personnel arrived at the accident scene shortly thereafter. William Kennerson and David Ray Richardson were trapped inside the carry-all and had to be extricated therefrom. Kennerson was rendered semiconscious by the impact and sustained injuries including a cerebral concussion with a basilar skull fracture, two fractures of the hip, and lacerations of the elbow. Richardson sustained a severe injury to his right leg consisting of an open fracture of the tibia with a closed fracture of the fibula. After being removed from the carry-all, both were transported by ambulance to the Abrom Kaplan Memorial Hospital in Kaplan.
Richardson and Kennerson brought these suits seeking damages for the injuries they sustained in the accident. Made defendants were Donald R. Royer, Talen's Landing, Inc., Continental Insurance Company, Talen's insurer, and Carl Anthony Vaughn Gibbs, individually and as representative of Certain Underwriters at Lloyd's, London, Talen's excess insurer. Royer, Talen's and Continental Insurance Company filed third party demands against Kennerson and the State of Louisiana, through the Department of Transportation and Development (DOTD). Athena, Inc. and its insurer, Mission Insurance Company, intervened in the suits claiming reimbursement for the maintenance and medical benefits paid on the plaintiffs' behalf. The suits were consolidated for trial with all issues being triable by the jury except for the third party demand against the DOTD which was tried by the trial judge.
After a nine day trial, judgment was rendered on November 17, 1983, in favor of plaintiffs and against Royer, Talen's, Continental Insurance Company and Gibbs, in solido. The judgment also dismissed the third party demands against the DOTD and Kennerson with prejudice. The jury awarded damages to Richardson in the sum of $898,467.00, and to Kennerson in the sum of $200,000.00. The judgment stipulates that the in solido liability of the defendant insurance companies is to be limited in accordance with the policies issued to Talen's Landing, Inc. Finally, judgment was rendered in favor of intervenors ordering Richardson to pay unto Mission Insurance Company the sum of $18,174.75 for reimbursement of maintenance and cure benefits, and Kennerson to pay the sum of $10,232.05 for the same.
Royer, Talen's, Gibbs and Continental Insurance Company have taken suspensive appeals from such judgment.

*679 BLOOD ALCOHOL TEST RESULTS
Appellants contend that the trial judge erred in refusing to admit into evidence the blood alcohol content report from Smith Kline Clinical Laboratories, Inc. (Smith Kline) and Acadiana Medical Laboratories (AML). The purpose of attempting to introduce these records was to establish the blood alcohol content of Kennerson on the morning of the accident. The test results indicated a 0.08% blood alcohol content.
A blood sample was allegedly drawn from Kennerson at Abrom Kaplan Memorial Hospital (Hospital) on the morning of the accident. According to the deposition of State Police Officer Oscar Theriot and his attached accident report, the blood test was performed by Dorian Lee, a medical technician at the Hospital. Officer Theriot testified that the test was performed at the request of the hospital. He further stated that he had not requested the blood test because "... the driver had an I.V. started on him, so it would be no good for me." Robert Frederick, a medic for Acadian Ambulance Service, testified that, at the accident site, he cleaned Kennerson's arm with alcohol before starting a glucose I.V. on him.
Dorian Lee's deposition was put into evidence as a proffer by defendants. In her deposition, she testified that she did not remember Mr. Kennerson nor did she remember ever taking a blood sample from him. She did testify that had she taken a sample, it would have been at the request of the hospital, since she never takes blood samples requested by the state police. Dr. David Tate was the first physician to examine Kennerson at the hospital. In his deposition, Dr. Tate stated that he did not request a blood alcohol test on Kennerson because there was no medical reason for him to do so. He stated he thought the test had been requested by the state trooper investigating the accident.
Dorian Lee testified that had she performed the test, she would have scrubbed the arm with a non-alcoholic prep. She then would have extracted the blood and placed it in a test tube. This tube would have been capped with a grey rubber stopper and the patient's identification placed on a piece of paper and wrapped around the test tube with a rubber band. She testified that she never used a cork on a test tube.
Since the Kaplan Hospital does not have the necessary technical facilities for performing blood alcohol quantitative analysis, all such tests are forwarded to AML in Lafayette, Louisiana. From there, the samples are forwarded to Smith Kline in Houston, Texas, where the actual tests are performed.
After a blood sample is taken at the hospital, the test tube is placed in an open box where it is retrieved by a courier from AML. The courier takes the sample to AML in Lafayette. The evidence shows that the sample of Kennerson's blood, which AML received, was topped with a cork. According to the deposition of the executive vice-president of AML, there was no chain of evidence letter attached to Kennerson's sample. He also stated that he can only assume that the tube contained Kennerson's specimen. He noted that there were past incidents involving mix-ups with blood samples. All samples would then be picked up at AML by a courier from Smith Kline who would take the samples to the Lafayette airport. The samples would be placed on a plane bound for Houston. Another courier from Smith Kline would pick up the samples at the Houston airport. There are no records as to who the actual couriers were who handled Kennerson's blood sample, nor could anyone at either AML or Smith Kline identify specifically the persons who handled the sample at their facilities.
Once the sample was tested at Smith Kline, the results were transmitted to AML's computer terminal by phone. AML's terminal received the information and printed it out. AML in turn transmitted this information by teletype to the hospital. The hospital attached this information to Kennerson's hospital records.
At trial, defendants attempted to introduce these records as prima facie proof of *680 their contents under the hospital records exception to the hearsay rule as set forth in La.R.S. 13:3714 and 13:3715.1.
The Supreme Court in State v. Trahan, 332 So.2d 218 (La.1976), held that, because the medical records rule is a statutory exception to the hearsay rule, it is essential that all of the formalities prescribed in the statute be followed before such records are admissible in evidence. The results of the blood test taken at Smith Kline fail to qualify as hospital records of Abrom Kaplan Memorial Hospital for a number of reasons. La.R.S. 13:3714 required, at the time of trial, that the record be one of a hospital in this state. Smith Kline is located in Houston, Texas. It is neither a hospital nor is it in the State of Louisiana.
Appellants contend that the record is a medical record of Abrom Kaplan Memorial Hospital which is in this state. We disagree, however, even assuming this argument to be valid, there are other requisites of La.R.S. 13:3715.1 which were not satisfied by the report in question. La.R.S. 13:3715.1 E (3) provides that, in order for the records to be admissible, the custodian must certify "that the records were prepared by the personnel of the hospital or facility, staff physicians, or persons acting under the control of either, in the ordinary course of the business of the hospital or facility at or near the time of the act, condition, or event." (Our emphasis).
The record is clear that neither AML nor Smith Kline are under any type of control by Abrom Kaplan Memorial Hospital. The tests performed at Smith Kline are done totally independent of any outside influence. Additionally, the blood alcohol test on Kennerson's sample was performed three days after the sample was drawn from Kennerson. Considering all of the above, we find that the trial court correctly refused to admit the results of Kennerson's blood tests by way of the medical records exception.
Appellants alternatively argue that the chain of evidence necessary to lay a proper foundation for the admissibility of blood tests has been met. We disagree. Our jurisprudence holds that, before any such test result can be admitted in any civil or criminal case, the party seeking to introduce such evidence must first lay a proper foundation for its admission by connecting the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. Pearce v. Gunter, 238 So.2d 534 (La.App. 3rd Cir.1970), writ denied, 239 So.2d 543 (La.1970); Swanson v. Estate of Augusta, 403 So.2d 118 (La.App. 4th Cir. 1981), writ denied, 407 So.2d 732 (La.1981).
The evidence is clear that these requirements were not met in the instant case. There is a complete lack of evidence as to who the couriers were who transported the sample from Kaplan to Lafayette and then on to Houston. There is conflicting evidence as to whether the proper procedure was used in the drawing of the sample, i.e., whether there was any alcohol contamination of the sample due to the method in which the I.V. was inserted into Kennerson's arm. There is also conflicting testimony as to who actually ordered the blood test to be taken. Furthermore, there is insufficient evidence that the test tube was not tampered with. Dorian Lee testified that all blood samples from that hospital were capped with grey rubber stoppers. AML claimed that the sample they received from the hospital was capped with a cork. Thus, the proper preservation of the blood between the time it was drawn and the time it was tested was not proven.
We find that this chain of evidence does not satisfy the requirements of the law, and the evidence as to the result of Kennerson's blood test was properly excluded by the trial court.
However, even were we to concede that the trial judge did err in failing to admit the results of the blood alcohol test, we find that such error would have been harmless since there is no causitive relationship between Kennerson's blood alcohol level and the accident. There is no evidence *681 whatsoever in the record to indicate that Kennerson contributed to or could have avoided the accident. The passengers in the Athena vehicle all testified that Kennerson was not driving erraticly nor did he have an opportunity to avoid hitting the eighteen wheeler. Although Officer Theriot stated in his deposition that he smelled alcohol on Kennerson's breath,[1] this testimony was not corroborated by any other person at trial. None of the medics from Acadian Ambulance Service, nor the rescue workers, nor Officer Kenneth Langlinais detected any alcohol on Kennerson's breath, despite the fact that they all had come in close contact with him. We conclude that there is a total lack of evidence which could even suggest that Kennerson was in any way responsible for the accident.

TRAFFIC ENGINEERING EXPERT
Appellants argue that the trial judge erred in refusing to qualify John Freeman as an expert in traffic engineering.
La.R.S. 15:466 provides:
"The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion, and before any witness can give evidence as an expert his competency so to testify must have been established to the satisfaction of the court."
The qualification of an expert witness rests within the sound discretion of the trial court and his determination will not be disturbed except for a showing of manifest error. Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64 (La.App. 4th Cir.1979); Matter of Aaron, 417 So2d 105 (La.App. 3rd Cir.1982), affirmed after remand, 434 So2d 624 (La.App. 3rd Cir.1983).
In the present case, the evidence reveals that Freeman graduated from the University of Akron with a Bachelor of Science degree in mechanical engineering. His past employment record reveals that he was employed as a process and design engineer for a machine company, the chief engineer at a manufacturing company, a research engineer at a research house, the supervisor of a mechanical engineering department, and a designer of rockets for nuclear submarines. He also worked as a project engineer for the California State Highway Department where he was involved in a study of the criteria for the design of a highway system in California. He worked for two years in the oil industry and then moved into a consulting engineering business. He started his own consulting engineering firm which provides investigative engineering services to insurance companies and attorneys. In the course of his consulting work, he has done land development work.
Freeman is not a member of the Institute of Traffic Engineers, has not completed any workshops or seminars in the field of traffic engineering, and had never before qualified as an expert in the field of traffic engineering in any court. He also was never employed as a traffic engineer.
Considering the summation above set forth, we find that the trial judge did not commit clear error in refusing to qualify Freeman as an expert in the field of traffic engineering. The purpose of an expert witness is to give an opinion based upon his professional qualifications and experience. Hunnicutt v. Kent, 434 So.2d 91 (La.App. 5th Cir.1982), writ denied, 435 So.2d 442 (La.1983). Freeman's qualifications in the field of traffic engineering are notably lacking.

LIABILITY OF DOTD
Appellants' third assignment of error is that the trial court erred in finding the State of Louisiana, through the Department of Transportation and Development (DOTD) not liable for the plaintiffs' injuries. Appellants assert that DOTD is liable because of their failure to properly and adequately sign the approach to the intersection of highways 35 and 335. Specifically, defendants point to DOTD's failure to maintain a "Stop Ahead" sign on Highway *682 335 westbound, thereby creating a hazardous intersection.
Royer testified at trial that he had driven past this intersection five or six times during the past three months. He claimed that he had noted a "Stop Ahead" sign as he traveled Highway 335 eastbound earlier that morning and was looking for a similar sign on his return trip. He asserted that he was relying on the sign to warn him of the approaching intersection, since the dense fog prevented him from seeing more than 30 feet ahead of him. Yet he testified that despite the thick fog, he was driving between 40 and 45 mph that morning.
Although there was no "Stop Ahead" sign on Highway 335 westbound on the morning of the accident, there was a junction and a destination sign located prior to the intersection. A reflectorized junction sign was located 482 feet from the center line of Highway 35. Also, a destination sign was located 334 feet from the center line of Highway 35 and, as previously noted, large reflectorized stop signs were positioned at the intersection. John Freeman, who was qualified as an expert in accident reconstruction, testified that an eighteen wheel tank truck traveling 40 mph on a damp road needs between 174 to 215 feet to come to a complete stop. Thus, had Royer started braking at either the junction or the destination sign, he could have easily stopped the eighteen wheeler prior to the stop signs at the intersection.
Royer testified that he did not see either the junction or the destination sign. He asserted that because of the dense fog, he was keeping his full attention on the road ahead of him. Yet, at the same time, he contends that he was looking for the "Stop Ahead" sign to warn him of the approaching intersection.
DOTD does owe a duty to the traveling public to erect signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road. Vervik v. State of Louisiana, Department of Highways, 302 So.2d 895 (La.1974). However, as stated on original hearing in Vervik, supra, at 897:
"There are no hard and fast rules established in law governing the particular type warning to be given in the various factual situations arising in these cases. It is understood, however, that the warning should be so designed in size and character as to adequately warn and alert the traveling public to the danger ahead. Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of these factors, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty." (citations omitted).
In our view, the several highway markers above referred to were sufficient to give adequate and timely warning of the approaching intersection and the duty of a westbound motorist to come to a complete stop at the intersection. We agree with the trial court's conclusion that the sole proximate cause of the accident in question was Royer's inattentive driving at an excessive rate of speed under the prevailing weather conditions. Motorists traveling upon Louisiana's highways are charged with the duty to exercise reasonable care in the operation of their vehicles, which duty encompasses the obligation to maintain proper control of their vehicle and a proper lookout for hazards, which by use of ordinary care and observation one should be able to see. We find no error in the trial court's dismissal of Royer's, Talen's and Continental's third party demands against the State of Louisiana, through the Department of Transportation and Development.

RICHARDSON'S AWARD
David Ray Richardson was awarded damages totaling $898,467.00 by an eleven to one jury vote. Appellants claim that such award is excessive.
Richardson was a passenger in the carryall van which was taking the five Athena *683 employees on a job near Kaplan. He was sitting in the seat directly behind the driver, Kennerson, when the accident occurred. As a result of the accident, Richardson was trapped in the vehicle. While in the vehicle, Richardson continually complained of the pain he was suffering in his right leg. After being extricated from the van by the Kaplan Rescue Unit, Richardson was rushed by ambulance to Abrom Kaplan Memorial Hospital.
Dr. Roland Charles Miller, an orthopedic surgeon, treated Richardson at the hospital. Richardson's injuries consisted of an open fracture of the tibia (the inner and usually larger of the two bones between the knee and the ankle), and a closed fracture of the fibula (the smaller bone between the knee and ankle) of the right leg. The tibia bone was actually protruding out from the skin of his right leg. Richardson was taken into surgery where Dr. Miller set the bones and placed the leg in a "Hoffman Device", otherwise known as an external fixator. This device was used in lieu of placing the leg in a cast in order to leave the ruptured skin exposed to facilitate faster healing of the wound and to allow drainage.
The "Hoffman Device" is a metal device consisting of eight long pins which run through the bone of the leg perpendicular to the length of it. The pins are pushed through the skin and drilled through the bone and then pushed back out through the skin. The function of the pins is to hold the bone in position. The pins can be readjusted as necessary to correct any misalignment of the fracture.
Dr. Miller noted that the injury included some soft tissue damage to the leg. He classified Richardson's injury as a severe fracture in which the injury and the surgery were very painful.
Richardson remained hospitalized for a week. Dr. Miller followed his progress while he was in the hospital and noted straight alignment of the bones.
Following his release from the hospital, Richardson was under the care of Dr. Jeffery C. Fitter, an orthopedic surgeon in Morgan City. Because of the bulky "Hoffman Device", he was semi-immobilized at this time. Richardson complained to Dr. Fitter of the pain he was experiencing in his leg. Dr. Fitter at first found no evidence of infection or malalignment of the bone, but when he examined Richardson on March 29, 1982, he noted that the fracture was not healing properly.
On April 19, 1982, Richardson was seen by Dr. Fitter at the emergency room of the hospital in Morgan City. Richardson's leg had begun to swell and there was drainage coming from the pins. Dr. Fitter noticed that Richardson was developing an infection of the pins where they crossed through the skin. Although the fracture was not yet stable, Dr. Fitter decided to remove the "Hoffman Device" for fear that the infection would spread to the bone. On the following day, the device was removed and Richardson was placed in a below-the-knee cast. Two weeks later, Richardson was changed to a full leg cast because of the pain which he was experiencing in the short cast.
Dr. Fitter again saw Richardson on May 12, 1982. At this time, Richardson was complaining of pain at the fracture site. The x-rays revealed that the fibula had healed but the tibia had not. Dr. Fitter observed some circulation damage to the tibia. Dr. Fitter considered the delayed union of the tibia abnormal. Additional surgery was considered at that time.
In June of 1982, there was still motion at the fracture site although there was evidence of some bone healing around the fracture. Dr. Fitter noticed some recent drainage from the lower pin sites, indicating a continuing low-grade infection.
Because of his financial circumstances (his only income at the time was $84.00 per week maintenance benefits being paid by Athena through Mission Insurance Company), Richardson was forced to return to Alabama to live with his parents. While in Alabama, he was treated by Dr. Charles P. Beddow, an orthopedic surgeon.
*684 Dr. Beddow found that the fracture had still not healed. Richardson continued to complain of pain. Dr. Beddow opined that this fracture was taking longer than usual to heal. He diagnosed the infection of the leg as osteomyelitis. He considered further surgery as a strong possibility.
In August of 1982, upon Dr. Beddow's recommendation, Richardson began treatments on an electric stimulator. This is a device which is attached to the outside of the cast whereupon an electric field is generated in the leg. It is a painless procedure which Richardson was instructed to do about ten hours a day.
Richardson saw Dr. Beddow again on September 17, 1982. He was no longer experiencing pain at the fracture site. The x-rays revealed that the fracture had finally begun to heal, although there were still signs of pin tract infection. Richardson was placed in a short leg cast at the beginning of December. The pin tract infection had healed by this time and there was notable healing of the fracture. Richardson continued treatments on the electric stimulator.
On December 29, 1982, Richardson was taken off of the stimulator and taken out of his cast. Dr. Beddow noticed a slight malalignment of the fracture but he did not consider that it would be a severe impairment to Richardson. He did note that Richardson walked with a slight limp.
Richardson was dismissed from Dr. Beddow's care in February of 1983, about one year post accident. At this time, Dr. Beddow concluded that Richardson had soft tissue damage and had some impairment of the circulation in his right leg due to the considerable amount of scarring. This impairment could cause future problems with swelling and some pain was expected due to the scarring. Dr. Beddow recommended an exercise program for Richardson in order to rehabilitate his knee and ankle. In summary, Dr. Beddow estimated that Richardson had 10% permanent-partial disability of the body as a whole due to the injury. This impairment would prevent him from doing any very heavy activity including a large amount of lifting, walking or climbing.
Dr. Fitter examined Richardson one final time in September of 1983. He found that Richardson had a healed fracture of the tibia. Richardson was still complaining of pain, swelling and stiffness of his knee and ankle. Dr. Fitter explained that the stiffness was due to the muscle damage around the ankle. He also noted that the circulation in his right leg was impaired and that Richardson walked with a slight limp, due to mild atrophy of the quadriceps. The pin sites were still tender at that time. Dr. Fitter estimated that Richardson has a 10% permanent disability, preventing him from doing very heavy labor, or performing a job which would require standing for any prolonged length of time. He speculated that Richardson would always have some constant, mild pain in his leg.
The only other orthopedic surgeon to examine Richardson was Dr. James Charles McDaniel. Dr. McDaniel examined plaintiff on September 8, 1983. After a fortyfive minute examination, Dr. McDaniel concluded that the scars were completely healed over, there was no infection, and the fractures were well-healed and in normal alignment. Dr. McDaniel concluded that Richardson has 5-10% impairment of the leg, but such impairment would not prevent him from performing any job which he had previously done. Dr. McDaniel recommended that Richardson enter into a vigorous exercise program for three to four weeks prior to his re-entry into the work force.
At the time of his injury, Richardson was 27 years old and single. He had attended school up until the tenth grade. From that time on, Richardson had a somewhat sporadic work history. He worked as a stock boy, a farm hand, a laborer in a sign shop, a carpenter and a security guard. Whenever he was in between jobs, Richardson would chop wood to sell. He served in the Army for a year where he was trained as a telephone installation man and a pole climber. According to his income tax returns over the past nine years, Richardson's maximum *685 annual income was $3,125.25 which he earned in 1981. Richardson claims that his income tax returns are not indicative of his actual earnings since he never reported what he earned chopping wood or working for his uncle as a carpenter.
Richardson has not worked since the accident. He claims that he attempted to help his brother build a house but was unable to stand on his feet for over two hours. He applied for various jobs but to no avail. He did not think that he would ever be able to chop wood for a living again.
In February of 1983, Richardson underwent an extensive examination by Dr. Thomas J. Hannie, a psychologist. After numerous personality and occupational tests, Dr. Hannie concluded that Richardson was in need of vocational and psychological counseling. Dr. Hannie felt that Richardson would need about 50 hours of vocational rehabilitation counseling at $45.00 per hour and about six months of psychological counseling at between $80.00 to $100.00 per hour.
Based upon the entire battery of tests and clinical observations, Dr. Hannie made the following observations: (1) Richardson was suffering from significant anxiety and depression; (2) he is not well-adjusted and has a difficult time socializing; (3) he suffers from underlying feelings of inadequacy and will continue to feel that way as long as his pain continues and he is unable to return to work; and, (4) he has a severe drinking problem which was aggravated by his injury.
Dr. Hannie opined that the accident and resulting injury was the overwhelming cause of Richardson's depression. He stated that, although Richardson drank before the accident, it was not until after the accident that he became an alcoholic. Dr. Hannie was also of the opinion that Richardson enjoyed his job at Athena and would have continued working there had it not been for the accident.
Additionally, Dr. Hannie made certain vocational findings about Richardson. He concluded that Richardson enjoys doing hard, manual work but does not like working very closely with other people. He suggested possible employment in the field of telecommunications, assembly line work, or a cashier's position.
Dr. Roger Burford, an economist appearing on Richardson's behalf, estimated Richardson's loss of past wages and fringe benefits to be in the amount of $37,776.89. Included in this amount is a $25.00 per day expense allowance which Athena employees were paid whenever they went to work out of town. At the time of the accident, Athena employees worked out of town approximately 50% of the time. Accordingly, Dr. Burford included this allowance based upon half of the work days which Richardson missed. Without the inclusion of this expense allowance, the amount of his loss of past wages would be $31,332.88. Dr. Kenneth Boudreaux, an economist testifying on behalf of the defendants, calculated Richardson's loss of past wages from the time of the accident until the trial at $8,162.28.
Dr. Burford calculated Richardson's loss of future wages and fringe benefits based upon the following facts and assumptions: (1) Richardson was making $4.70 per hour at the time of the accident and was averaging 60 hours per week; (2) he was paid time and a half ($7.05) for all overtime over 40 hours per week; (3) his hospitalization benefits were $1200.00 per year; (4) his annual expense allowance totaled $3900.00; (5) he would have received two weeks base pay as a Christmas bonus each year. Utilizing these figures, Dr. Burford came up with projected annual earnings for Richardson of $17,766.00. In calculating Richardson's future loss wages, Dr. Burford assumed a 7% annual inflation rate, a 1.2% per year productivity increase, a 12.4% annual medical cost increase, a 7.25% discount rate, a 10% annual average increase in the petroleum industry and a 30.25 work life expectancy.
Dr. Burford then concluded that, considering the wages being earned by Richardson at the time of accident, i.e., $17,766.00 annually and assuming he could now find *686 employment at $6.00 per hour, working a 40 hour week, Richardson's future loss wages would total $547,129.00. (Without inclusion of the $25.00 per day expense allowance, the figure would be $433,225.00). Assuming a job at $3.50 per hour (minimum wage at the time of the calculations), working 40 hours per week, Richardson's future loss wages would be $747,222.00 ($633,318.00 excluding the expense allowance).
Dr. Boudreaux also calculated his estimate of Richardson's future loss wages. His figures assume an annual base pay of $7,500.00. He arrived at this figure by using the sum of Richardson's earned income for the year immediately prior to the accident ($5,200.00), plus a yearly food allowance of $1,095.00, and annual hospitalization benefits of $1,200.00. This base figure differs drastically from the $17,766.00 base figure used by Dr. Burford.
Dr. Boudreaux subtracted from the $7,500.00 annual earning capacity figure, the annual minimum wage income of $6,968.00, leaving $532.00 as Richardson's annual loss of income. This figure was then discounted at 10% for 30.1 years. Dr. Boudreaux utilized a 3% and 6% annual income increase. At 3% annual income increase, he calculated Richardson's total future loss wages at $6,965.00. At 6% annual income increase, Richardson's total future loss wages would be $9,664.00.
The standard of appellate review in cases such as the present was set forth in Reck v. Stevens, 373 So.2d 498 (La.1979) as follows:
"Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
"With regard to appellate review of the much discretion of the trier of fact in the award of general damages, La.C.Civ.P. art. 1934(3), we stated (after exhaustive review of the facts, and reversing the appellate court for disturbing (on the basis of prior awards) the trier of fact's award) in Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127, 132 (1967) (Italics ours):
"`The law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the discretion vested in the trial court.... The facts and circumstances in the other neck injury awards, relied upon by respondent as showing that this award was all out of proportion with the previous awards for similar injuries, causes them to have little or no relevancy for purposes of demonstrating the excessiveness of this award.'
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco [v. Winston Industries, Inc., 330 So.2d 649 (La.App. 3rd Cir.1976)] for purposes of then determining what would be an appropriate award for the present case."
A review of the award made in this case is complicated by the fact that it was a lump sum award. There is simply no way of knowing the amount awarded by the jury for each element of damages. However, we can make certain conclusions based upon the facts in the record.
*687 The record indicates that Richardson's total proven medical expenses were $13,650.75. Future medical costs would include $2250.00 for 50 hours of vocational rehabilitation counseling and $2600.00 for psychological counseling for six months at $100.00 per session.
Viewing the evidence in a light most favorable to Richardson, we conclude that his past lost wages amounts to $31,332.88. We reject the figure of $37,776.89 as set forth by Dr. Burford since it included the $25.00 per day travel expense allowance which is not income per se. All of the above items amount to the sum of $49,833.63. Subtracting this figure from Richardson's total award of $898,467.00 leaves the sum of $848,633.37 remaining for future loss wages and general damages.
It is the plaintiff's burden of proving that his disability will cause him to suffer a loss of income. Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982). The medical testimony is consistent that Richardson suffers a 10% permanent-partial disability. We must now determine whether $848,633.37 is an excessive sum in light of Richardson's loss of future wages and general damages.
The figures attested to at trial by the two economists for Richardson's loss of future wages fall at totally opposite ends of the spectrum. Dr. Burford estimated his future loss of wages to be $433,225.00 assuming Richardson could find employment at $6.00 per hour, and $633,318.00 assuming he could find employment at the minimum wage rate. Dr. Boudreaux estimated a loss of future wages at $6,965.00 assuming 3% annual income increase and $9,665.00 at a 6% annual income increase.
The amount of the award granted to Richardson by the jury prompts our conclusion that the jury accepted the figures attested to by Dr. Burford. For the following reasons, we find Dr. Burford's calculations inordinately high. Dr. Burford based his projections on the trend in the oil industry over the ten years prior to trial. From this observation, he utilized a 10% annual income increase in his calculations. Considering the vast turnabout in the oil industry since the early 1980's, Dr. Burford's calculations are grossly inaccurate. The record indicates that Athena has experienced a 40% reduction in their work force since the time of the accident. There had been no 10% wage increase. In fact, the wages paid by Athena have only slightly increased since the accident. Athena was forced to lay off numerous employees and only worked out-of-town 20% of the time as opposed to its prior 50% out-of-town operations. We also find error in the base income figure employed by Dr. Burford. He estimated that Richardson would have made $17,766.00 in his first year of employment at Athena. This figure totally disregards Richardson's past work history, which, according to his tax returns, shows that he never earned over $3,125.25 in a single one year period for the nine years he worked prior to the accident. To assume that Richardson would thereafter work continuously without interruption for the next 30 years of his life is an assumption not supported by the record.
There are also factors which have similarly led us to reject the calculations of Dr. Boudreaux, among which are the figures used by Dr. Boudreaux as Richardson's annual base earning capacity and the high discount rate of 10%.
The appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Coco v. Winston Industries, Inc., 330 So.2d 649 (La.App. 3rd Cir.1976), reversed as to quantum, 341 So.2d 332 (La. 1976); Alexander v. Leger, 423 So.2d 731 (La.App. 3rd Cir.1982), writ denied, 430 So.2d 75 (La.1983).
Loss of future earning capacity cannot be calculated with mathematical certainty. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981). The amount of damages awarded should compensate plaintiff for the difference between his ability to *688 earn immediately prior to the injury and his ability to earn after the injury. Coco, supra; Wilson v. Aetna Casualty and Surety Company, 401 So.2d 500 (La.App. 2nd Cir.1981).
After reviewing the record in its entirety, we conclude that a proper award for Richardson's loss of future earnings and the highest amount which could have been awarded upon a reasonable evaluation of the evidence is $180,000.00. Although Richardson will never be able to work as a roustabout in the oilfields, the record makes clear and Richardson himself testified that he would be able and willing to work as a dispatcher, truck driver, cashier or cabinet maker. Assuming availability of employment and Richardson's willingness to seek and maintain employment, his wage loss during his future work life expectancy should be very moderate.
We similarly conclude that the jury's award of general damages is grossly excessive and constitutes a clear abuse of the trier of fact's much discretion. Richardson's special damages amount to the sum of $49,833.63. We have determined that the highest amount reasonably awardable for loss of future wages is the sum of $180,000.00. When the total of these items is subtracted from the total jury award, this leaves a general damage award of $668,633.37, a sum which, as aforesaid, we determine to be clearly excessive. We have previously set forth a rather detailed summary of the evidence insofar as it bears upon the injuries sustained by Richardson in the accident, the pain which he endured, his course of treatment, and the medical estimates regarding the extent of his residual disability. No good purpose would be served by paraphrasing this evidence. Suffice it to say that, in our view, the highest amount of general damages which is awardable upon a reasonable evaluation of the evidence is the sum of $200,000.00. For these reasons, the judgment of the trial court will be amended so as to reduce the award to plaintiff, David Ray Richardson, from the sum of $898, 467.00 to the sum of $429,833.63.

KENNERSON'S AWARD
William J. Kennerson, III, was awarded damages in the sum of $200,000.00. Appellants assert that such award is excessive considering his injuries and the fact that he returned to his prior employment within a short time following the accident.
Kennerson was the driver of the carry-all on the morning of the accident. After the collision, Kennerson's arm was pinned between the carry-all and the road. The rescue workers noted that he was bleeding about the head and the arm. After being extricated from the van, he was taken to Abrom Kaplan Memorial Hospital. Kennerson was examined by Dr. David Tate who found Kennerson's injuries to consist of lacerations on the left elbow and above the right eye, bleeding from the right external ear canal, and an undersized right pupil. Kennerson was thereafter transferred by ambulance to Lafayette General Hospital where he was examined by Dr. James R. Rivet, a neurological surgeon. Dr. Rivet also observed the presence of blood behind Kennerson's right ear drum as well as a sluggish right pupil. His left eye was swollen and bruised. Because of these symptoms, Kennerson was diagnosed as having a basal skull fracture. However, the CAT scan and skull x-rays performed on Kennerson both turned up normal.
Kennerson was also examined by Dr. James Charles McDaniel, an orthopedic surgeon. Dr. McDaniel's x-rays showed two fractures of the pelvic bone. He also sutured the cut on Kennerson's left elbow.
Kennerson remained hospitalized for a week. He suffered a loss of memory for several days while hospitalized. He was placed on medication to prevent swelling of his brain for the first four days in the hospital. Kennerson remained in bed for three weeks following his hospitalization.
On April 14, 1982, some two months post accident, Kennerson was released by Dr. McDaniel to perform light work for Athena. On May 10, 1982, Kennerson was also discharged from Dr. Rivet's care. On May 21, 1982, Kennerson returned to the hospital *689 due to pain in his left elbow. Dr. McDaniel performed surgery on the elbow to remove the foreign material which had lodged itself in the bursa and had become inflamed.
Kennerson was released by Dr. McDaniel to his regular manual work with Athena on July 10, 1982, some five months after the accident. Dr. McDaniel opined that the pelvic fractures had healed normally and that Kennerson should be able to do any type of activity he did prior to the accident, with some occasional discomfort. Kennerson testified at trial that he still has pain in his hip which prevents him from playing football, running, jumping and skiing.
Kennerson proved medical expenses in the amount of $9,392.05 and lost wages in the amount of $4,326.40. Subtracting these amounts from his total award leaves $186,281.55 for general damages.
In view of the record and the fact that Kennerson returned to full work duty with Athena within four months of the accident, we find that the jury clearly abused its much discretion in awarding Kennerson the sum of $186,281.55 in general damages. We conclude that $75,000.00 is the highest award of general damages which a jury could have reasonably awarded to Kennerson for his injuries. The judgment in his favor will be amended accordingly.
For the reasons assigned, the judgment of the trial court is amended so as to reduce the principal amount of the award to David Ray Richardson from the sum of $898,467.00 to the sum of $429,833.63. In all other respects, the judgment of the trial court is affirmed. Defendants are cast for all costs of this appeal.
AFFIRMED AS AMENDED.
NOTES
[1] Officer Theriot died before this case was brought to trial.