CARTER, Judge,
dissenting.
In a unanimous, peremptory grant of a supervisory writ, the Louisiana Supreme Court set aside this court’s prior judgment and remanded the case for this court to rule on the admissibility of the results of McLaughlin’s alleged second blood-alcohol test and to reconsider the fault of the parties in light of the admissibility ruling.
I respectfully dissent from the opinion of the majority because it is clearly wrong in its determination of “admissibility” and fails to properly reconsider the fault of the parties resulting in substantial injustice to the plaintiffs (McLaughlin’s parents).[1]
ADMISSIBILITY OF BLOOD-ALCOHOL TEST RESULTS
Before the results of a blood test analysis can be admitted into evidence, the party seeking to introduce such evidence must first lay a proper foundation for its admission by connecting the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis, and properly tested. Richardson v. Continental Insurance Company, 468 So.2d 675 (La.App. 3rd Cir.1985); Lapoint v. Breaux, 395 So.2d 1377 (La.App. 1st Cir.1981), writ denied, 399 So.2d 611 (La. 1981).
I disagree with the majority’s conclusion that plaintiffs failed to properly preserve their chain-of-custody objection to the admissibility of the blood-alcohol test results in the trial court. During Dr. Ralph Maxwell’s testimony, plaintiffs’ attorney made the following objection:
Your Honor, I object to any further testimony until we have established what the line or chain of evidence is, chain of custody is in this case. The doctor has given testimony that he gave it to the path lab at the Seventh Ward Hospital, not the lab that made the tests.
The trial judge did not rule on the objection because defendants’ attorney discontinued *347 this line of questioning directed toward admission of the blood-alcohol test results. After Dr. Maxwell’s testimony, a hearing on the admissibility of the test results was conducted outside the presence of the jury. The trial judge took the matter under advisement. During Stanley Chigoy’s testimony, plaintiffs’ attorney again objected “for the reasons stated earlier,” and the trial judge then ruled that the test results were admissible. Plaintiffs’ attorney certainly “[made] known to the court ... his objection to the action of the court and his grounds therefor” as required by LSA-C. C.P. art. 1635, and his objections on appeal are “the same arguments as urged by counsel at the trial.” Calderon v. Johnson, 453 So.2d 615 (La.App. 1st Cir.1984).
The majority’s conclusion that counsel for plaintiffs did not preserve the chain-of-custody objection is erroneous and is not supported by the record. The record indicates that counsel for plaintiffs objected no less than sixteen different times to the admissibility of the alleged second blood-alcohol test results, and the majority of these objections were directly or indirectly related to the absence of a chain-of-custody.
Further, I do not agree that counsel for plaintiffs has waived any objection to the alleged second blood test by not raising the issue in this court. In assignment of error number 3, counsel for plaintiffs set forth:
3. The trial judge erred in allowing the results of the blood alcohol test as found by the coroner in evidence.
In subsequent portions of plaintiffs’ brief, counsel for plaintiffs argues:
Whether a blood-alcohol test can be admitted into evidence depends upon a proper foundation “connecting the specimen with its source, showing that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis and properly tested.” Holmes v. Christopher, 435 So.2d 1022, 1028 (La.App. 4 Cir.1983). These requirements were not met in the instant case. Thus, a proper foundation was not laid for the admission of the blood-alcohol test.
I also disagree with the majority’s conclusion that the blood-alcohol test results were admissible. The majority has applied a criminal standard to a civil proceeding. Even if the standard is applicable, defendants have failed to show by a preponderance of the evidence that “the object [the blood-alcohol test results] is the one connected with the case.” See State v. Sweeney, 443 So.2d 522 (La.1983).
The record contains conflicting evidence as to how the blood sample in question was taken and by whom. Trooper McGlothern testified that after Dr. Elhale pronounced McLaughlin dead on arrival at Seventh Ward Hospital, Dr. John Turnon drew a blood sample at approximately 9:30 p.m. using the regular police kit McGlothern furnished him. McGlothern testified Tu-rnon had difficulty drawing the blood and could fill only one-half of a vial, which was sealed and labeled using standard procedures. McGlothern then turned the vial in at Troop L at the end of his shift the next morning to be mailed to the State Police Crime Laboratory. He further testified he attempted to locate Dr. Maxwell at the hospital, but did not see Maxwell that night.
Dr. Maxwell testified, however, that he pronounced McLaughlin dead at the scene, drew a blood sample at the scene and gave it to the state police, then drew another blood sample during the autopsy which he sent to The Pathology Laboratory (TPL). On cross-examination he testified he was positive he had attended the scene, but was not certain whether he had taken blood at the scene. He then testified he drew two blood samples from McLaughlin’s heart during the autopsy. He stated he used a standard police kit containing a gray, rubber-topped vial, which he then labeled, sealed, and gave to the state police. He testified he labeled the second sample, then handed it to an unnamed “pathology laboratory person,” who labeled it with the patient’s name, the time,, Maxwell’s name, and Maxwell’s billing account number.
There was no testimony as to how the blood sample was handled between the time it was given to the hospital pathology *348 laboratory person until it was delivered to TPL by an unnamed courier. The hospital pathology laboratory person who labeled the vial did not testify, nor did the courier who transported the vial from the hospital to TPL.
Stanley Chigoy testified that the TPL courier picked up the sample at some place specified by Dr. Maxwell and brought it to TPL in Metairie, where Chigoy analyzed it. Chigoy did not know who put the label on the vial or whether the sample was taken from a gray-topped vial or a red-topped vial. He testified TPL did not keep vials in sealed kits, unless they were sealed when received, and they rarely, if ever, got sealed kits from Dr. Maxwell. Chigoy’s records did not indicate that the McLaughlin sample was sealed.
Thus, the evidence in this case is conflicting as to how the blood sample was taken, and there is no evidence as to the proper labeling of the sample, the proper preservation of the sample before it reached TPL, or the transportation between the hospital and TPL. There is nothing but the label on the vial with Dr. Maxwell’s billing account number to connect the testimony of Dr. Maxwell with the testimony of Stanley Chi-goy. It is clear that this evidence was insufficient to establish by a preponderance of the evidence that the blood tested was that of McLaughlin. Cf Bufkin v. Mid-American Indemnity Company, 528 So.2d 589 (La.App. 2nd Cir.1988); Richardson v. Continental Insurance Company, 468 So.2d 675 (La.App. 3rd Cir.1985), writ denied, 474 So.2d 1304 (La.1985); Holmes v. Christopher, 435 So.2d 1022 (La.App. 4th Cir.1983), writs denied, 440 So.2d 723, 724, 765 (La.1983); Lapoint v. Breaux, supra.
A thorough review of the record in the instant case shows that the chain of evidence did not satisfy the minimum requirements under the law and that the blood-alcohol analysis results were improperly admitted.
STANDARD OF REVIEW
Other than the inadmissible blood-alcohol test results, there was no credible evidence indicating that McLaughlin had been drinking or was intoxicated at the time of the accident. The error in admitting the blood-alcohol test results was of such a serious and prejudicial nature that it justifies this court’s giving no weight to the jury’s verdict. I respectfully submit that this court should review the facts without reference to that evidence and render judgment on the merits. McLean v. Hunter, 495 So.2d 1298 (La.1986); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). See Robinson v. Estate of Haynes, 509 So.2d 128 (La.App. 1st Cir.1987).
NEGLIGENCE OF GLASPER
A review of the facts of the instant case, without reference to the blood-alcohol test results, reveals that Howard Glasper testified he was familiar with the intersection and, from his vantage point high in the cab, could clearly see to the overpass. His account of the accident indicated that he stopped at the stop sign on Stein Road, looked both ways, saw no oncoming cars, and pulled into the intersection. When he first saw the McLaughlin vehicle, the cab was entirely in the eastbound lane and half of his trailer was onto La. 1040. He saw the vehicle come over the overpass in the wrong lane and then swerve back and forth from the eastbound to the westbound lane. In order to avoid a head-on collision, he ran his cab onto the shoulder, and McLaughlin’s vehicle then collided with his trailer.
Earle H. Boudreaux, defendants’ reconstruction expert, testified that, in his opinion, Glasper acted prudently under the circumstances and that the accident was caused entirely by McLaughlin’s intoxication. This opinion, however, was based upon Glasper’s account of the accident and the inadmissible blood-alcohol test results. Glasper’s testimony simply is not credible in view of the physical evidence. There were no yaw marks indicating that McLaughlin’s vehicle swerved from lane to lane several times from the overpass to the intersection. Furthermore, the McLaughlin vehicle would have been traveling greatly in excess of 65 miles per hour to have been out of Glasper’s sight (at least 900 feet) at the time Glasper entered the inter *349 section, yet all three witnesses who testified as to McLaughlin’s speed stated that it was between 55 and 65 miles per hour.
In view of the distance from the overpass to the intersection (approximately 900 feet) and the speed at which the experts agree McLaughlin was traveling, the state police accident reconstruction expert, Trooper Blunschi, was of the opinion that Glasper failed to yield the right-of-way to McLaughlin and pulled out in front of McLaughlin when there was little or no time for him to take evasive action is much more credible. Accordingly, I find that the majority is in error in not finding that plaintiffs proved by a preponderance of the evidence that Glasper was negligent and that his negligence was a proximate cause of McLaughlin’s death.
NEGLIGENCE OF McLAUGHLIN
There is no admissible evidence in the record to suggest that McLaughlin had been drinking or was intoxicated other than the circumstantial testimony of Trooper McGlothern that he smelled “an aroma of an alcoholic beverage” in McLaughlin’s vehicle. Troy Milton, McLaughlin’s lifelong friend, testified that, to his knowledge, McLaughlin did not drink. Furthermore, Dr. Merlin H. Allen, McLaughlin’s family physician, testified that approximately six hours prior to the accident McLaughlin was discharged from the hospital, where he had been undergoing treatment for ulcers, with instructions to avoid the use of alcohol.
It is interesting to note that Trooper McGlothern also testified that there were other aromas in and around the vehicle, including the smell of anti-freeze. He also testified that there was a hydraulic floor jack in the vehicle that “appeared to have been propelled forward from the rear of the vehicle forward.” Although this line of questioning was not pursued, the aroma of hydraulic fluid could explain some of the “aromas” in and around the vehicle.
There is also no evidence that McLaughlin was traveling at a high rate of speed. Troopers McGlothern and Blunschi estimated McLaughlin’s speed to be 55 miles per hour, while defendants’ expert, Earle Bou-dreaux, estimated his speed to be 55 to 65 miles per hour. Additionally, there is no evidence that McLaughlin was negligent because he failed to apply his brakes and was across the centerline of the highway when the crash occurred. Blunschi testified that McLaughlin probably had only two to three seconds to act before impact, and thus the collision could not have been avoided even if McLaughlin had applied his brakes.
Clearly, defendants failed to show any negligence on McLaughlin’s part that contributed to this accident. I submit that Glasper’s negligence was the sole proximate cause of McLaughlin’s death, and plaintiffs should recover from Glasper, McNabb, Fireman’s Fund, and Hammond Sandblasting.
DAMAGES
Plaintiffs prayed for damages for “deprivation of companionship, love, and affection” of their 21-year-old son. Plaintiffs presented testimony of relatives, friends, the family physician, and themselves which revealed an extremely close and loving relationship between plaintiffs and their son.
McLaughlin lived with his parents all his life. His father was partially blinded and crippled by electrocution when McLaughlin was one year old, and when he became old enough to drive, McLaughlin took his father everywhere he needed to go. After graduation from high school, McLaughlin went to trade school to learn refrigeration repair so he could repair the air conditioners and coolers on the family poultry farm. At the time of his death, McLaughlin was working a day job, then coming home each evening and working on the poultry farm.
Plaintiffs testified that McLaughlin and his father were inseparable; he ate his meals at home sitting between his parents; he went into his parents’ room every evening to chat before bedtime. After McLaughlin’s death, his father had a ceme-tary dedicated on their home place and moved his son’s body “home so he could be with me ... where he didn’t want to move from.” I submit that each parent should *350 receive an award of $150,000.00 for loss of companionship, love and affection.
For the above reasons, I respectfully dissent from the opinion of the majority.

. This dissent also substantially reflects the views expressed by Judge Melvin Shortess who dissented in the prior unpublished opinion of this court.