381 So.2d 1303 (1980)
Mary Margaret Forry, wife of/and William H. BESNARD
v.
DEPARTMENT OF HIGHWAYS, State of Louisiana and the City of New Orleans.
No. 10856.
Court of Appeal of Louisiana, Fourth Circuit.
March 11, 1980.
Rehearing Denied April 18, 1980.
*1304 Dodd, Barker, Boudreaux, Lamy & Gardner, Harold J. Lamy, New Orleans, and James W. Armstrong, III, Covington, for plaintiffs-appellees.
Philip K. Jones, Norman L. Sisson, Marshall W. Wroten, Baton Rouge, Jesse S. Guillot, New Orleans, for State of Louisiana, Dept. of Transp. & Development, defendant-appellant.
Before REDMANN, BOUTALL and CHEHARDY, JJ.
CHEHARDY, Judge.
Plaintiffs-appellees, Mary Margaret Forry, wife of/and William H. Besnard, filed suit against the Department of Highways, State of Louisiana, and the City of New Orleans for injuries she sustained as a result of an automobile accident.
The case was tried in Civil District Court for the Parish of Orleans before John M. Holahan, Commissioner and Judge ad hoc. Based on the Commissioner's written report, Judge Henry J. Roberts, Jr., rendered judgment in favor of the plaintiff and against the defendant-appellant Louisiana Department of Highways for $120,323.29, together with interest from judicial demand and all costs of the proceedings, including expert witness fees. The plaintiff's suit against the City of New Orleans was dismissed.
The accident occurred on May 21, 1976, at about 7:15 a. m., on Chef Menteur Highway in the City of New Orleans between Cerise and Camelot Streets. Plaintiff Mary Besnard, who at the time was 23 years old, was driving her Chevrolet Nova at 40 to 45 miles an hour on Chef Menteur Highway. There was traffic in front, to the left and behind plaintiff's automobile. The two-lane median-divided highway on Chef Menteur, *1305 proceeding east to west, was bordered by a shell shoulder until the highway approached Cerise Street. At that point a paved bus stop extended out northward from the travel lane of the highway. The white line painted on the right side of the highway, extended past the bus stop, headed west. At that point a curbing at Cerise Street confronted the driver. The white line appeared to lead traffic in the right lane into the curbing and shoulder at Cerise.
Mrs. Besnard testified that:
"I was travelling west bound on Chef Menteur Highway in the right hand lane and there was a soft shoulder on the right hand side and right before Cerise Street the Chef Menteur widens to accommodate a bus lane. Beyond that on Cerise Street the curb in the road narrowed. I remained in the right hand lane of traffic because I couldn't make it over into the left lane of traffic because there were cars over there, but I pulled further to the left because the road had narrowed. As I pulled further to the left Chef Menteur Highway then starts to swing back over to the right and as I pulled to the left they were blocking me so still within my lane of traffic I pulled further to the right."
She added that, when she pulled to the right, she hit an object or obstruction and lost control of her car; that she did not know what she had hit; did not see anything in the roadway before she struck it; was looking ahead in the traffic but was concerned with traffic in the left hand lane which appeared to be pulling into her lane causing her to pull to the right.
The evidence establishes that at the point of impact with the broken piece of curbing that extended into the roadway, plaintiff struck her head, became dazed and, despite her attempts, could not control her car. Plaintiff's car entered the shoulder of the highway and violently struck a utility pole, causing her to suffer extensive personal injuries.
On cross-examination defendants' witnesses testified that this portion of Chef Menteur Highway was of unsafe design; was misleading and confusing to the motoring public; that the broken and protruding curbing when struck could cause a vehicle travelling at 40 miles an hour to lose control; and that the broken curbing should have been fixed without delay to avoid a wreck.
The preponderance of the evidence clearly establishes that the broken protruding curbing struck by plaintiff had been in need of repair for at least two to five years prior to the accident and that at least on one occasion prior to the accident the proper authorities had been notified. Numerous previous accidents had occurred at this particular location caused by automobiles striking the curbing, blowing tires, losing hub caps and on several occasions meeting with serious upsets.
A reading of the record and testimony substantiates the Commissioner's following description of the area of and the approach to the scene of the accident:
"Prior to the intersection of Cerise Ave. and Highway 90, the sides of U.S. 90 remain unenclosed by curbings of any sort. At periodic intervals bus lanes were created in order to facilitate transit passengers. These bus stops were located three or four blocks apart from one another. One of these bus stops was located at the northeast intersection of Cerise Ave. and U.S. 90. Immediately across Cerise Ave., in direct alignment with the bus stop the Department of Highways built an upright curbing approximately 6-7 inches high which traversed the entire arc formed by a radius of the intersection and formed the traveled right-of-way along the north side of U.S. 90.
"At a point on this curbing, where the radius of the intersection meets with the straight curbing, a defect in the highway developed. The curbing at this point is made of concrete which forms not only the upright part of the curbing but the horizontal bed of the roadway for approximately 12 inches. A section of this curbing and gutter formation approximately 3-4 feet long had become displaced, and this section of concrete was elevated and *1306 projected into the roadway for several inches. The vertical displacement was approximately six inches and the horizontal displacement about the same. Such displacements did not affect the roadbed or the lane widths except to the limited area involved.
"Because the roadway itself is shifted to the right immediately after this intersection, there is a tendency of oncoming traffic to anticipate such by giving way to the right.
"The highway, at this point, according to the evidence, is highly traveled, and approximately 35,000 cars per day pass the intersection involved on U.S. 90. Evidence showed that the curbing, at points along the arc formed by a radius, was heavily damaged by vehicles which had overrun the curbing after they had entered the bus stop lane and were confronted with the curbing." (Emphasis ours.)
There was substantial testimony as to whether a hazardous condition did exist at the collision site and whether the Highway Department had actual or constructive notice of such a defect.
Susan Stubenrauch, a resident of New Orleans East for the past 13 years and presently living on Camelot Street, testified that she saw Mrs. Besnard's car hit the broken curbing, go out of control and hit a telephone pole; that the tire of Mrs. Besnard's car was caught in between the broken curbing; and that plaintiff was trying to control the car but she could not. Miss Stubenrauch added that she had been living in the same location for 10 years before the accident, just a few blocks from the accident site; that the broken curbing had been there for three years; and that she had also seen other cars hit the curbing and blow out tires. She admitted, however, on cross-examination, that she saw plaintiff hit the curbing and had only assumed plaintiff hit that particular spot.
Madeline D. Stubenrauch, Susan's mother, testified that on the day of the accident, the curbing in question was broken and a chunk of concrete abutted out about a foot, and that this condition had existed for at least five years. She said she has never hit the curbing herself because she was familiar with it.
Vickie McBrayer, a passenger in Miss Stubenrauch's car, said she was not looking at first because the sun was in her eyes; however, when she heard Susan scream she said she turned around and Mrs. Besnard's car was already on the grass. She added that at that point Mrs. Besnard was grasping the wheel trying to turn to the left to get back on the road and she then hit the post. She also testified that although she had never hit the curbing in question, she had come close and had seen other drivers come close to hitting the curb, swerve, and almost hit another car. To avoid the curbing a car in the right hand lane would have to go into the left hand lane, she said.
Ms. Joseph Gastaver, who lives on Chef Menteur Highway between Cerise and Camelot, said, when shown a photograph of the accident site, that the broken curbing had been that way two or three years. Ms. Gastaver also testified that since 1972 she had been finding hub caps between the shoulder of the road and her fence two or three times a week. When she had a full trunk of them, she took them to a junkyard and sold them. She admitted that she had never seen any accidents and that many of the cars turning on Cerise onto the Chef could have been hitting the curb there. She also admitted that although she used the Chef Menteur Highway regularly she never called to report this curb to anyone.
Percy Dillon was working at an Exxon service station on Chef Menteur Highway across the street from the accident site and had worked there a number of years before the accident. Shortly after he arrived at work, at 7 a. m., he was pumping gas when he saw a car hit the curbing on the side of the highway, go out of control and hit the post 14 or 15 feet in front of it. He said the car was in the right hand lane going west, then he heard the car hit the curb where a piece of concrete sticks out and it went off the highway and hit the post. Later he said he didn't actually know what the car *1307 hit, but when he heard the noise he saw the car going toward the post. He said nothing he saw indicated the car was going over the speed limit. He also said that over the years he had seen quite a few people hit the broken curb and he would repair the damaged tires once or twice a month.
Joseph Nunez, a resident of Camelot Drive, said that the broken curbing was sticking out, creating a hazard that had existed since 1972. He added that he saw three or more accidents in connection with it, with cars having one or two blowouts, and one lady losing control of her car and wrecking it in 1975.
The deposition of Colonel Michael W. Glassinger, a resident of Camelot Drive from 1972 until his death, was read at the trial. He had testified that he personally called the City and the State Highway Department prior to May of 1976 to complain about the accidents in connection with this curbing. He had also reported the problem to the Castle Manor Civic Association, whose spokesman said he would take action on the problem.
He said as a result of one of the previous accidents that he had personal knowledge of, an iron retention band had been left standing straight in the air and after six months the City had come out and cut it down. He also said that approximately one year after he moved to his home on Camelot Drive another car crashed into the same curbing. He explained that although he had not seen either accident happen, he had inspected the aftermath.
Boyd L. Gautreaux, an employee of the Louisiana Department of Transportation and Development and a traffic engineer, testified that the breaks in the subject curbing could have been due to busses or traffic striking it. He said that he had seen the broken curbing jutting out three or four inches, but when shown pictures admitted that it looked a lot more severe than he recalled.
Leon Robert Blandian, Maintenance Superintendent for the Louisiana Department of Transportation and Development, stated that he knew of no complaints that were called into the department regarding this site, but that no actual records were kept of complaints called in. He did say, however, that if he had been aware of the condition of the curbing, he would not have let it go for weeks, although some other problems might have been given immediate priority over this one.
Robert Jackson, a foreman stationed at the Gentilly office of the Department of Transportation when the accident occurred, testified by deposition that part of his and his crew's duties was to look for hazards and report them and put up barricades until they are repaired. He said if he had seen this curbing he would have reported it to Blandian, who would have certainly told him to fix it at least temporarily "before somebody had a wreck."
Frank Heroy, Assistant Chief Location and Design Engineer, Office of Highway Transportation, said that the highway at the point of the accident conformed to the standards in existence at the time it was built, and that there is no record of the bus stop being added or any reconstruction, so there was no necessity for the Highway Department to upgrade the highway to current standards. He said that if a motorist were coming from east to west, the curbing at Cerise Street gives such an appearance that drivers normally tend to move to the left, but as they near the curbing the road begins to swing to the right, so they would move back to the right. He also said that the gutter in the photographs sticks out 18 or 24 inches, well into the permissible area of travel.
James Armstrong, an attorney, testified that he visited the roadway on June 12, 1976. He testified that he and Mr. Besnard measured the broken curbing and how far it protruded out into the roadway. He testified that his picture marked P-15 showed that the curbing extended at least 12 inches out into the roadway from the normal curbing. He also measured the vertical upset or rise of the highway caused by the broken pavement. He testified that the inside portion of the broken curbing measured 6 inches in height and the outside portion of *1308 the broken curbing measured 3 inches in height. He further testified that there was no white striping along the shoulder where the broken curbing existed.
Felicien Perrin, a registered civil and mechanical engineer with experience in street design and layout, testified that the white striping on the right hand side of the roadway definitely leads traffic into the curbing at Cerise; that there was, in fact, a narrowing of the roadway; that traffic in the left lane tends to go straight rather than take advantage of some widening of the left hand lane just past Cerise; that traffic narrows down toward the right; and that the left hand lane of traffic moves to the right as it approaches Cerise due to the curve in the traffic to the right shortly past Cerise.
In Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir. 1976), and Willis v. State ex rel. Louisiana Department of Highways, 321 So.2d 819 (La.App. 1st Cir. 1975), the courts established that shoulders are included in this duty of maintenance of the highway department. Certainly curbings must also be maintained.
"It is generally accepted that `the Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. The Department is liable for damages only when it is shown (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the Department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it.' * * *." (Emphasis ours.) Breaux v. Louisiana Dept. of Highways, 347 So.2d 1290 (La.App. 1st Cir. 1977), at p. 1293.
The evidence preponderates that, whether or not the Highway Department (Louisiana Department of Transportation and Development) had actual knowledge of the broken curbing, the condition had existed for years and the Department should have known of the situation and corrected it.
Regarding the question of when constructive knowledge of a dangerous condition exists, the court said in Gayle v. Department of Highways, 205 So.2d 775, 780-81 (La.App. 1st Cir. 1967):
"One is presumed to have constructive notice of a defect or dangerous condition when it is shown to have existed for such a long period of time that knowledge thereof can be presumed, or that it can be said that one ought to have had knowledge of the condition."
The decision of whether a condition of a highway actually is a dangerous and hazardous one to an ordinary prudent driver is a factual one, and the court should consider physical aspects of the roadway, frequency of accidents at that place in the highway and testimony of expert witnesses in arriving at this factual determination.
In determining whether the plaintiff in a case of this sort is contributorily negligent, the court said in Reeves v. State, 80 So.2d 206, 210 (La.App. 2d Cir. 1955):
"The general rule is also well established and recognized in the jurisprudence of this state that a motorist using a public highway has a right to presume and to act upon the presumption that the highway is safe for the usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments or obstructions to which his attention has not been directed.
Blashfield's Cyclopedia of Automobile Law and Practice, Volume 5A, 387, `Highways', § 3320, states such rule as follows:
`In the absence of notice to the contrary, there are certain assumptions which may be indulged by a motorist as to the condition of public streets and highways, whether he be traveling by day or night. Among these are: (a) *1309 That the way is reasonably safe for travel and free from defects and unlawful obstructions; (b) That those charged with the duty of keeping it so have exercised a proper degree of diligence in so doing; (c) That it will not be obstructed unlawfully or in such a manner as to cause an injury to him while he is in the exercise of due and reasonable care; * * *.'"
In Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979), the Court said:
"Under a simple `but-for' analysis the accident would not have occurred had either the Highway Department not been negligent in failing to maintain the shoulder or the plaintiff not been negligent (and for present purposes we assume her inadvertent meandering was negligence) in moving the vehicle onto the shoulder. But this does not conclude the inquiry. Focusing on plaintiff's `substandard' conduct the question is whether the risk of injury from striking an unexpected, negligently maintained highway shoulder was a risk reasonably related to plaintiff's failure to drive entirely on the paved portion of the highway. We conclude that it was not. A motorist has a right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Conversely the Highway Department's duty to maintain a safe shoulder encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself travelling on or partially on, the shoulder.
"We conclude that plaintiff's conduct if indeed it was substandard is no bar to her recovery of damages occasioned chiefly because the Highway Department negligently failed to maintain a safe highway shoulder. * * *"
In Hudson v. State Department of Highways, 289 So.2d 505 (La.App. 3d Cir. 1974), plaintiff's judgment against the Department of Highways was affirmed on appeal. In this case plaintiff attempted to pass another vehicle as it moved toward him, crowding in the passing lane. In order to avoid a possible impact, he veered to the left and went on to the "rollover" curbing on the south side of the paved portion of the highway. Shortly after climbing the "rollover" curb, the plaintiff's left front and rear wheels struck a solid blunt concrete curbing which caused him to lose control of his truck. Both left tires blew out and rims of both left wheels were severely damaged in the way that could only be caused by a solid blunt object. The court concluded that the defect in question was hazardous and should have been repaired by the Highway Department and that it had either actual or constructive knowledge of its condition. The court further found that the plaintiff was not contributorily negligent.
In Parfait v. State Department of Highways, 334 So.2d 549 (La.App. 1st Cir. 1976), the plaintiff recovered a substantial judgment against the Department of Highways in excess of $300,000. The facts of this case revealed that the plaintiff was driving north at about 45 miles per hour when an oncoming south bound vehicle pulled into his lane, forcing him to take to the shoulder of the road to avoid a collision. While on the shoulder of the road, plaintiff's vehicle, after driving along on the shoulder for some distance, struck a hole in the shoulder. The hole in the shoulder of the road measured from 6 to 12 inches deep. When plaintiff's wheels struck one of these holes, he lost control of his car, ran across the highway and struck a large tree on the opposite side of the roadway. The trial court and the court of appeal found that plaintiff was not guilty of contributory negligence and that the Highway Department failed in its duty to properly maintain the shoulder of the road which resulted in a defect which proximately caused the accident. Though actual notice of the hole was not proven, the testimony of a resident of the area established that the holes had been there for sometime before the accident and that the only maintenance carried out by the Highway Department was to put shovels full of shell into the holes occasionally.
*1310 A complete reading of the record and the evidence does not disclose any error in the finding of fault by the Commissioner and Judge ad hoc, much less that manifest error essential if this court is to disturb the finding of the trial court. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
We agree with the following observation by the Commissioner in his finding for the plaintiff:
"From the testimony adduced the Court is convinced that the projection and defect in the curbing existed on the date of the accident and for an indeterminate but substantial period of time preceding the date of the accident. It is also found that such amount of time is far in excess of the amount of time necessary for the highway department to have made itself aware of the existence of the defect, and to have properly repaired such.
"According to the testimony, U.S. 90, at the location of the accident, was used by the maintenance superintendent, the foreman, and maintenance crews on almost a daily basis. Because of such the Department of Highways is charged with notice of the existence of the defect.
"The Court was unable to reach a conclusion with respect to how the displacement of the curb took place. It would seem from evidence shown that the displacement grew progressively worse after the accident. Similar conclusions could be reached for the time prior to the accident. In any event the degree of displacement had reached the point of perceivable danger months prior to the accident.
"The Department of Highways argues that the safe passage of 35,000 cars per day is convincing evidence that the design, construction and repair of the highway at this point was adequate. The physical evidence refutes this. The curbings on the arc were shown to be overrun by vehicles to the extent that the elevations of the curbings were reduced. The design of the intersection with the bus stop lane deceptively invites driver to enter such lane presupposing that the highway was widened to the three lanes visible ahead. Instead, after entering such lane, a driver is immediately confronted with the first upright curbing constructed on the incoming highway. Thus it was shown that the design, construction and failure to maintain were all elements present at the time of the accident.
"The unexpected confrontation with these elements are not the risk of the driver, Mrs. Besnard. The duties of the Department of Highways, spelled out in the law, were not performed, and, as a consequence, it must respond in damages."
It is our opinion that a dangerous or hazardous condition existed at the accident site; that the condition was the proximate cause of the accident; that plaintiff was free from contributory negligence; and that the Highway Department (Louisiana Department of Transportation and Development) violated their duty to maintain the curbings in a reasonably safe condition.
Further we find that the defective condition of the curbing which was dangerous to motorists existed on the date of the accident and for at least two years prior to the date of the accident and that the Highway Department should have known of the defective condition and repaired same.
We next consider the damages allowed plaintiff by the trial court. Plaintiff Mary Besnard suffered severe pain and permanent injuries from the accident. She was unconscious when she was taken to Methodist Hospital where it was determined that she had either a fractured sternum or a severely injured costochrondral area, an abnormal EEG and what had appeared to be a coronary contusion. A plastic surgeon successfully performed surgery, but still, on close viewing, there is some visible pulling of the skin and some lines which are slightly apparent.
She also incurred a fracture of her right ankle, left knee and elbow. Mrs. Besnard was treated by Dr. H. L. Colcolough for shock, concussion, the abnormal EEG and contusion of the heart and left lung. After extended surgery she remained in the hospital *1311 from May 21, 1976 to June 19, 1976. After leaving the hospital she received physical therapy at home.
Mrs. Besnard had sustained a comminuted fracture of the right elbow (interarticular fracture of the distal humerus). The splintered bone in the fractured joint was set back in place under open reduction, pinned in place and then put in a cast.
Plaintiff has residual and painful disability resulting from the fractures. She has stiffness in the elbow after activity and changes of weather. She has pain on the use of the arm, particularly as the result of repeated motions. Mrs. Besnard testified that she cannot, for example, peel a potato without her elbow hurting. In addition, she wakes up at night with pain in her elbow and stiffness of the joint. She cannot pick up anything heavy as it places strain on the injured elbow. Dr. Alain F. Cracco, the orthopaedic surgeon, further indicated that the elbow lacks 25 degrees of full flexion and 30 degrees in extension, and that further surgery may be necessary to reset the radial head. If this were done Mrs. Besnard would require one week of hospitalization and six weeks of treatment after surgery. Although surgery was not indicated at this time, Dr. Cracco suggested that because of her prolonged period of pain and discomfort and presence of traumatic arthritis in the elbow fracture, future surgery is not unlikely. He attributed arthritic changes in the elbow to the accident and estimated the permanent, partial disability to the right elbow at 50%. There is also a wide scar on the elbow, stretched in appearance, very visible and measures 3 to 4 inches.
Dr. Cracco also estimated the permanent partial disability at 45% of the left knee and 10% of the right ankle. Also plaintiff has a long, noticeable disfiguring scar on her left knee approximately 9 inches in length. Plaintiff, a young married woman, is very sensitive to her scars and as a result will not wear a dress or shorts.
Dr. Kenneth M. Dieffenbach, a plastic surgeon, testified that even with additional corrective surgery to repair the scars, they would still remain visible and bear a disfiguring mark.
Plaintiff testified that she tires easily when walking any distance; cannot stand for long periods of time; cannot go up stairs without difficulty; and cannot play volley ball, tennis, bowl or skiall of which she enjoyed prior to the accident. Several pins and screws also remain in plaintiff's injured joints. Mrs. Besnard's physician also testified that she suffered great emotional upset as a result of having to send her child to Colorado to be cared for by her parents subsequent to the accident.
The Commissioner's report, adopted by the trial court, recommended:
"For all of the pain and suffering and the residual impairment of physical functions to this twenty-six year old lady the Court recommends an award of $100,000.00. The medical expenses were shown to be $14,939.29 to the date of trial. Lost wages for the period from the date of the accident, May 21, 1976 to March 14, 1977 was shown to be $5,160.00. Additional time was lost when the hardware was removed from her body and she lost $224.00 working time. There being no showing made of an absolute need and/or desire for future medical attention, no award should be made for such."
Under the Louisiana Supreme Court's latest directives on the issue of quantum, as articulated in Reck v. Stevens, 373 So.2d 498, 501 (1979), the Court said:
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse *1312 has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
"In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) `similar' injuries, see Coco [v. Winston Industries, Inc.,] at 341 So.2d [332] 334 [La.1977].
"However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979)."
We find that the trial court has not abused the "much discretion" allowed in its finding of facts and the making of its award of damages, and we affirm the judgment of the trial court. The defendant-appellant is to pay all costs of this appeal.
AFFIRMED.