IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 23, 2015 Session

**MARK THOMAS CHURCH ET AL. v.
CHARLES BLALOCK & SONS, INC. ET AL.**

**Appeal from the Circuit Court for Johnson County
No. X3322     Thomas J. Seeley, Jr., Judge**

**No. E2014-02077-COA-R3-CV-FILED-OCTOBER 9, 2015**

This action stems from a motor vehicle accident resulting in two fatalities that occurred at the intersection of the newly constructed State Route 91 and Old State Route 91 in Johnson County, Tennessee. Alleging that the design and construction of the intersection were negligent, the plaintiffs filed suit in the Johnson County Circuit Court against Johnson County and the general contractor who constructed the intersection. The plaintiffs also filed claims against the Tennessee Department of Transportation with the Tennessee Claims Commission, asserting that the intersection constituted a dangerous condition on a roadway. The claims filed with the Claims Commission were transferred to Johnson County Circuit Court, and all claims were subsequently consolidated in this action. Johnson County and the general contractor were later dismissed as defendants, such that the trial proceeded regarding the claims against the State only. Following a bench trial, the court granted judgment to the plaintiffs, determining the State to be 53% at fault and the deceased driver to be 47% at fault. The court awarded damages accordingly. The State timely appealed.[1] We conclude that the evidence preponderates against the trial court's determination that the intersection constituted a dangerous condition on the roadway or that the risk involved was foreseeable. We therefore reverse the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

---

[1] Johnson County and the general contractor are not parties to this appeal.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Dawn Jordan, Senior Counsel, Office of Attorney General; Nashville, Tennessee, for the appellee, State of Tennessee.

Gary E. Brewer and Steven W. Terry, Morristown, Tennessee, for the appellee, Mark Thomas Church.

Edward R. Sempkowski, Morristown, Tennessee, for the appellee, Sherry Carlson, Administratrix of Estate of Patricia Ann Lunsford.

**OPINION**

On January 23, 2010, sixty-eight-year-old Jean Ellen Church was traveling north in her vehicle on Divide Road, also known as Old State Route 91, in Johnson County, Tennessee. Ms. Church was driving toward Damascus, Virginia. Her sister, sixty-five-year-old Patricia Ann Lunsford, was a passenger in the vehicle. Unfortunately, when Ms. Church reached the intersection of Divide Road and the newly constructed State Route 91, she failed to stop her automobile at the stop sign. Ms. Church's vehicle skidded into the path of an oncoming car, causing a collision. Tragically, both Ms. Church and Ms. Lunsford were killed in the accident.

In the years prior to this accident, State Route 91 had been reconfigured so that the highway would bypass downtown Mountain City to reduce the truck traffic in that area. Before this reconstruction, drivers traveling north on Old State Route 91 toward Damascus proceeded along a somewhat curvy road with no stop signs or traffic lights. Following completion and the opening of the new State Route 91 on July 13, 2009, drivers approaching from the south on Old State Route 91 or Divide Road encountered a new "T" intersection, including a stop sign. Upon bringing their vehicles to a halt, drivers could turn right if they chose to continue toward Damascus. Ms. Church, who had undergone back surgery eight months earlier, had resumed driving on the day of the accident. As the trial court observed, she had likely not driven through this new intersection prior to the accident.

On June 15, 2010, Ms. Church's son and executor of her estate, Mark Church, brought the instant action on behalf of the estate, himself, his father, and his siblings. The initial action, raising claims of negligence and negligence per se, was instituted against Johnson County, Tennessee, and Charles Blalock & Sons, Inc., the contractor who constructed State Route 91 and the intersection in question. Mr. Church filed a similar complaint against the Tennessee Department of Transportation ("TDOT") with the Tennessee Claims Commission.

2

On June 24, 2010, Sherry Carlson, Ms. Lunsford's daughter, filed a complaint against Johnson County, Tennessee, and Charles Blalock & Sons, Inc., regarding Ms. Lunsford's death. The action was initiated by Ms. Carlson on her own behalf and as administratrix of her mother's estate. Ms. Carlson also filed a similar complaint with the Claims Commission against TDOT. Following the filing of various motions in these actions, the claims against TDOT were transferred to the trial court pursuant to Tennessee Code Annotated § 9-8-404(b), and all of the pending claims filed by Mr. Church and Ms. Carlson (collectively, "Plaintiffs") were consolidated into one action.

Charles Blalock & Sons, Inc., subsequently filed a motion for summary judgment, which was denied by the trial court. Johnson County likewise filed a motion for summary judgment, asserting that Divide Road was controlled by the State of Tennessee and not the County. The trial court granted Johnson County's motion for summary judgment on the basis asserted. Thereafter, Plaintiffs voluntarily dismissed their claims against Charles Blalock & Sons, Inc., such that the sole remaining defendant was the State of Tennessee.

A bench trial on the merits was conducted on July 29 and 30, 2014. Upon the trial's conclusion, the court took the case under advisement, subsequently entering a memorandum opinion and order on September 12, 2014. In its order, the trial court found that the State was negligent regarding the intersection at issue because (1) the risk of drivers running the stop sign was foreseeable, (2) the State had sufficient advance notice to enable it to take appropriate measures, (3) the measures adopted by the State were insufficient to address the dangerous situation, (4) such lack of reasonable care by the State contributed to the cause of the accident and the resultant fatalities, and (5) Ms. Church's failure to heed the stop sign contributed to the cause of the accident and the associated deaths. Applying principles of comparative fault, the trial court assigned 53% of the fault for the accident to the State and 47% of the fault to Ms. Church.

The trial court awarded damages for Ms. Church's funeral expenses, the pecuniary value of her life, and loss of consortium in a total amount of $526,936.33. The court also awarded similar damages for Ms. Lunsford in the total amount of $351,929.33. Upon applying the percentage of fault attributable to the State, the court calculated the damages awarded for Ms. Church as $279,276.25 and the damages awarded for Ms. Lunsford as $186,522.54. The State timely appealed.

## II. Issues Presented

The State presents the following issues for our review, which we have restated slightly:

3

1. Whether the trial court erred in its determination that the State breached the standard of care by failing to install rumble strips.

2. Whether the trial court erred in finding Ms. Church only 47% at fault for the accident.

Ms. Carlson raises the following additional issues:

3. Whether the State's road design in creating the "T" intersection was negligent.

4. Whether the trial court properly awarded damages in favor of Ms. Lunsford's estate.

III. Standard of Review

Our standard of review is *de novo* with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Further, our Supreme Court has explained:

> Although it is true that the trier of fact has considerable latitude in allocating percentages of fault to negligent parties, appellate courts may alter those findings if they are clearly erroneous.

*Cross v. City of Memphis*, 20 S.W.3d 642, 644 (Tenn. 2000) (*citing Wright v. City of Knoxville*, 898 S.W.2d 177 (Tenn.1995) (internal citations omitted)).

IV. Claimed Negligence by the State

The State asserts that the trial court erred by concluding that the State breached the applicable standard of care. Claims may be brought against the State regarding dangerous road conditions pursuant to Tennessee Code Annotated § 9-8-307(a)(1)(J) (Supp. 2015), which provides in pertinent part:

> (a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as defined in § 8-42-101, falling within one (1) or more of the following categories . . .

4

(J) Dangerous conditions on state maintained highways. The claimant under this subdivision (a)(1)(J) must establish the foreseeability of the risk and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures.

All parties agree that Plaintiffs' claims against the State were based on this statutory subsection. Concerning such claims asserting dangerous conditions on state-maintained highways, our Supreme Court has previously explained:

> The Plaintiff has the burden of establishing that the State negligently created or maintained a dangerous condition . . . and further that foreseeability of the risks and notice had been given to proper State officials at a time sufficiently prior to the injury to enable appropriate remedial measures. T.C.A. § 9-8-307(a)(1)(C). The statute itself provides that the State's liability is to be predicated upon "traditional tort concepts of duty and the reasonably prudent person's standard of care." T.C.A. § 9-8-307(c). For purposes of determining liability under the statute, the State is to be treated as a private individual. T.C.A. § 9-8-307(a)(3), (d). Thus, for the purposes of deciding the State's liability after removal of immunity, the statute codifies the common law obligation of owners and occupiers of land. *Sanders v. State,* 783 S.W.2d 948, 951 (Tenn. [Ct.] App. 1989). We note that any discussion of "negligently created or maintained conditions," "reasonable care," and "foreseeability of risks" inescapably involves traditional principles of negligence law generally, these being: (1) a duty of care owed by the Defendant to the Plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause. *See McClenahan v. Cooley,* 806 S.W.2d 767 (Tenn. 1991).

*Hames v. State*, 808 S.W.2d 41, 44 (Tenn. 1991).

Regarding the proper definition to be applied to the statutory phrase, "dangerous conditions on state maintained highways," our Supreme Court has elucidated:

> Our statutes do not provide a definition of a dangerous condition, "on state maintained highways" for application in determining the State's liability under T.C.A. § 9-8-307(J). In *Holmes v. Christopher,* 435 So.2d 1022 (La. App. 4th Cir. 1983), the Court defined the duty of the State of Louisiana with regard to highway conditions and applied it to the Mississippi River Bridge Authority, one of the defendants in the case. We

5

find it to be an appropriate delineation of the factors involved in determining whether a dangerous condition exists on state maintained highways applicable to cases brought under T.C.A. § 9-8-307(J). We quote as follows:

> The decision of whether a condition of a highway actually is a dangerous and hazardous one to an ordinary prudent driver is a factual one, and the court should consider the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses in arriving at this factual determination. *Besnard v. Department of Highways,* 381 So.2d 1303 (La. App. 4th Cir. 1980), writ denied. 385 So.2d 1199 (La. 1980).

*Holmes,* 435 So.2d at 1026.

*Sweeney v. State*, 768 S.W.2d 253, 255 (Tenn. 1989).

In *Sweeney*, the High Court was confronted with a factual situation similar to the case at bar, wherein a question had arisen regarding the safety of a newly constructed section of road and whether the signage employed on the roadway was appropriate. *Id*. at 254. The Court considered all evidence regarding the physical aspects of the roadway, the number of accidents that had occurred at the situs, and the expert testimony regarding the propriety of the road's design and the signage utilized. *Id*. at 256-257. The Court concluded:

> The combination of a steep grade, sharp curve, inadequate signs, lack of other safety measures such as chevrons and/or guardrails, together with the inordinately high number of accidents at the situs established a dangerous condition within the meaning of T.C.A. § 9-8-307(a)(J). The 23 accidents after the reconstruction and prior to plaintiff's accident clearly provided the element of foreseeability of risk.

*Id*. at 257.

In the case at bar, the evidence at trial preponderated in favor of a determination that the new State Route 91 was constructed during the years 2006-2009 to provide a bypass such that traffic could be diverted away from downtown Mountain City. As a result of the new placement of State Route 91, Old State Route 91 was reconstructed from a road that formerly continued non-stop to Damascus, Virginia, into a roadway that thereafter resulted in a "T" intersection with new State Route 91. As such, the evidence

further demonstrated that as vehicle operators traveled north on Old State Route 91 toward Virginia, upon proceeding through a curve and reaching the new intersection, they were required to come to a complete stop before turning right, rather than simply continuing on a course to the right as the road had been originally constructed. The new State Route 91 and the subject intersection were completed and opened in July 2009. At the time the new intersection was ready for use, the situs contained and was marked by a thirty-inch by thirty-inch "stop ahead" sign, a thirty-inch by thirty-inch stop sign, and a white "stop bar" on the roadway pavement.

Following completion of the new roadway, the State learned of several motorists failing to stop at the stop sign. In August 2009, John Piercy, a civil engineer and Operations Specialist II with TDOT, sent an electronic mail message ("email") to Roger Colbaugh, then superintendent of maintenance for TDOT, stating the following regarding the intersection at issue:

> It has been brought to my attention that old SR 91 onto the new SR 91 has had many vehicles running the stop sign. The old SR 91 has a stop sign and an advanced [stop ahead] sign, it has been suggested possibly adding rumble strips. Also, at this intersection there is no sign indicating which way to Damascus VA, a sign would help. We are in the process of having Blalock's return old SR 91 speed limit signs, but it should be noted that turning onto the old SR 91 there should be added a 55 MPH speed limit sign returning it to its original speed limit. Please look at the signs from where our project ended on to VA to determine if added speed limit signs are needed, there was a complaint made by the THP. As noted during our project inspection, there are signs on US 421/SR 34 directing motorist to turn at Main St. for SR 91 and for interstate 81. The SR 91 signs need to come down and the interstate 81 sign should be moved to the new intersection with SR 91. Your help in contacting the appropriate departments (signs and maintenance) to resolve these issues will greatly be appreciated.

In his deposition, Mr. Piercy related that a state trooper had approached him regarding the fact that several drivers had run the stop sign at the new intersection following its opening. Upon inspection, Mr. Piercy observed and was concerned about a number of skid marks at the intersection. Consequently, Mr. Piercy informed his supervisor, Freddie Holly, who requested that he send the above-referenced email message to Mr. Colbaugh. Mr. Piercy stated that he knew additional signs were placed at the intersection thereafter.

It is undisputed that following an accident that occurred at the intersection in October 2009, the State installed additional signs in December 2009. From the evidence adduced at trial, it remains unclear which State official actually directed that the additional signs be installed. Upon these additions having been made in December 2009, the intersection contained the following signage:

1. A junction sign for State Route 91 located 670 feet before the intersection;
2. Two thirty-six-inch by thirty-six-inch "stop ahead" signs (one on either side of the road) located 320 feet before the intersection;
3. A directional sign with a right-hand arrow pointing toward Damascus prior to the intersection;
4. Two thirty-six-inch by thirty-six-inch stop signs (one on either side of the road) at the intersection;
5. A route sign for State Route 91 at the intersection; and
6. A horizontal, two-headed arrow across from the intersection to alert motorists of the requirement to turn left or right.

Plaintiffs called several witnesses to testify regarding the significant roadway and intersection changes following construction of new State Route 91. The witnesses included citizens who expressed familiarity with the layout of State Route 91 before it had been reconfigured. They also indicated having experienced difficulty when traversing the new intersection for the first time. Claiming insufficient signage to warn of the new intersection, the witnesses described driving "right through" the new intersection without being able to stop because they either failed to see the new stop sign or failed to anticipate the change in road conditions. Most witnesses, however, either failed to establish the timeframe during which they first encountered the new intersection or recounted that they drove through the intersection before December 2009 (when new signage was installed). Only one witness stated unequivocally that she had driven through the intersection approximately two weeks before the accident. Although Plaintiffs presented evidence of a number of citations issued to motorists disregarding the stop sign at the subject intersection prior to the date of the accident, only one of the citations was issued after the new signs were installed.

Nathan Vatter, a civil engineer and Regional Traffic Engineer for TDOT, testified that the State utilized the Manual on Uniform Traffic Control Devices ("MUTCD") to determine the appropriate placement of and necessity for certain signs along the roadway. As he indicated, the signs located at and along the roadway approaching the intersection at the time of the accident were appropriate in nature and placement, thereby exceeding the requirements of the MUTCD. As the speed limit nearing the intersection was forty-five miles per hour, Mr. Vatter opined that the placement of the "stop ahead" signs would provide a motorist traveling at that speed with over ten seconds to react to the sign and

8

bring a vehicle to a stop. Further, as he explained, the "T" intersection employed at State Route 91 and Divide Road was the preferred type of intersection because it provided the best line of sight for drivers.

When questioned regarding the use of rumble strips, Mr. Vatter responded that because there existed no standard for the installation of rumble strips at an intersection, such use was infrequent. While Mr. Vatter insisted that he never saw the email from Mr. Piercy stating that rumble strips had been suggested, he also explained that rumble strips and flashing lights were not required at any intersection. For this intersection, there existed a 900-foot sight distance for drivers approaching from the south. In his engineering judgment, Mr. Vatter opined that the signs employed at and along the roadway approaching the intersection, as well as the intersection's alignment and geometry, were appropriate and did not breach any applicable standard of care. While acknowledging that additional traffic controls could always be added, Mr. Vatter indicated that the State provided adequate notice of the intersection, further noting that excessive signage could sometimes reduce the traffic signs' effectiveness.

Sergeant Christopher Moore with the Tennessee Highway Patrol testified that he prepared an accident reconstruction report with respect to this incident. In his opinion, Ms. Church's vehicle was traveling at thirty-three miles per hour upon collision with the other vehicle. Sergeant Moore determined the primary cause of the accident to be Ms. Church's failure to stop at the stop sign.

Freddie Holly, the TDOT project supervisor in charge of construction of the intersection, testified that drivers were warned of the new intersection via construction signs and portable message boards during construction and for a short period thereafter. Various newspaper clippings were presented to demonstrate the publicity surrounding the opening of new State Route 91. According to Mr. Holly, Mr. Piercy informed him in August 2009 that a state trooper had complained of motorists running the stop sign at the subject intersection. Upon Mr. Holly's suggestion, Mr. Piercy sent the above-quoted email to Mr. Colbaugh, as the project by then had come under the direction of the maintenance department. Mr. Holly further explained that upon speaking to Mr. Colbaugh about the intersection, he received no further complaints.

Michael Bare, supervisor of highway marking for TDOT, explained that he installed the additional signage at the subject intersection on December 7, 2009. He claimed being instructed to install additional signs by either Mr. Vatter or Amanda Snowden, the engineer who was assistant regional director for TDOT.[2] Although not an

---

[2] Neither Mr. Vatter nor Ms. Snowden could specifically remember instructing Mr. Bare to install additional signs. Mr. Vatter stated that he had no knowledge of any issue with regard to the intersection or the email sent by Mr. Piercy prior to this case. Ms. Snowden disclaimed any knowledge of the email

engineer, Mr. Bare opined that by reason of the extent of sight distance for a driver approaching the intersection, the signage at the intersection was sufficient even before the additional signs were installed.

Leighton Sissom, a mechanical engineer and accident reconstructionist, was called to testify as Plaintiffs' expert. Mr. Sissom acknowledged that he had relied on information that Ms. Church had not driven through the subject intersection prior to the date of the accident. According to Mr. Sissom, if traveling at forty-five miles per hour, Ms. Church would have needed a stopping distance of 240 feet from her first sighting of the stop sign to complete her stop at the intersection. Based on that conclusion, he opined that the "stop ahead" signs located roughly 320 feet before the intersection were insufficient, because they were too far from the stop signs. Mr. Sissom also opined that the State should have employed the use of rumble strips or flashing lights at this intersection due to the drastic nature of the change in the roadway. According to Mr. Sissom, rumble strips allow a motorist to hear and feel a warning, rather than simply relying on personal observation of existing signage. Mr. Sissom also suggested that additional warnings should have been continued for at least a year following roadway completion until motorists had been afforded adequate notice of the change in roadway alignment.

Mr. Sissom stated that although he was not a civil engineer, mechanical engineering was the broadest of all the engineering disciplines. He acknowledged, however, having never prepared a traffic signage plan. Moreover, he was unfamiliar with the engineering judgment involved in determining the nature and placement of signage at a roadway intersection. Mr. Sissom did not perform a reconstruction of the accident, had never been to the subject intersection, and had not viewed the report prepared by Sergeant Moore. According to Mr. Sissom, he was unaware of any standards requiring the installation of rumble strips or flashing lights at an intersection. Moreover, he had never seen a study regarding the effectiveness of rumble strips at an intersection, conceding that their use would constitute an engineering judgment call. Mr. Sissom admitted that the cause of the motor vehicle accident was driver error.

The trial court found that the State was negligent regarding the intersection at issue because, *inter alia*, the risk of drivers running the stop sign was foreseeable. As our Supreme Court has instructed:

---

but stated that she did generally remember there having been a prior wreck or "near misses" at the intersection, causing them to "take a look at the intersection." Mr. Colbaugh testified that although he did not specifically remember receiving the email from Mr. Piercy, upon receipt, he would have forwarded it to the sign-marking office or his supervisor for review.

[A] risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable. Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability.

\* \* \*

The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries.

*Eaton v. McClain,* 891 S.W.2d 587, 594 (Tenn. 1994) (quoting *Doe v. Linder Constr. Co.,* 845 S.W.2d 173, 178 (Tenn.1992)).

Considering the evidence, the trial court found that the State was negligent by only installing visual signs rather than also including rumble strips relative to the intersection. Specifically, the court stated:

Notwithstanding the additional signage, people continued to run the stop sign as reflected by the skid marks still at the intersection and the testimony of Charlotte Berry, Doris Potter and Robert [Romanger].

\* \* \*

The benefit of rumble strips are fourfold: 1) they can be <u>seen</u> during daylight hours; 2) they can be <u>felt</u> by a vehicle crossing over them; 3) they can be <u>heard</u> as the vehicle passes over them; and 4) the cost of installation would have been minimal. Due to the significant and obvious problems at this intersection, which problems apparently were not cured by the additional signage, the Court finds that the State was negligent in failing to install rumble strips on old SR91 at its intersection with new SR91, which negligence was a cause in fact and legal cause of this accident and the consequent deaths of Ms. Church and Ms. [Lunsford]. The balancing of the risk and gravity of the harm against the action needed to be taken militates against the State. The burden on the State to have added the additional sensory elements of the rumble strips was slight. The State's "engineering judgment" was insufficient in this instance. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). The degree of care to be exercised by the

11

State must be commensurate with the degree of risk. *See West v. East Tennessee Pioneer Oil Co.*, 172 S.W.2d 545, 550-551 (Tenn. 2005).

Although we agree with the trial court that locating rumble strips at the approach to the subject intersection might have been of benefit to some motorists, we also recognize that "[t]he State [does] not have a duty to make the intersection absolutely safe." *See Huffer v. State*, No. M1999-01278-COA-R3-CV, 2000 WL 1156627 at \*3 (Tenn. Ct. App. Aug. 16, 2000) ("The only way to eliminate any chance of an accident at this intersection would be to eliminate the intersection.") (internal citations omitted). In other words, the fact that additional warning measures might have made the intersection safer does not necessarily establish that the intersection as it existed constituted a dangerous condition on the roadway. As previously stated, in determining whether a dangerous condition existed, we must consider "the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses in arriving at this factual determination." *See Sweeney*, 768 S.W.2d at 255.

Regarding the physical aspects of the roadway, the evidence demonstrated that the prior course of State Route 91 consisted of a somewhat curvy road that extended to Damascus, Virginia, without traffic signals or stop signs. The construction of the new State Route 91 resulted in the establishment of an intersection linking Old State Route 91 with the newly constructed State Route 91. According to Mr. Vatter, the "T" intersection that was employed at this junction was the preferred type because it provided the best line of sight for drivers. The evidence supported a determination that the most significant change for motorists following reconstruction of the roadway was that drivers would now emerge from a curve and encounter the intersection with new State Route 91, requiring a stop followed by a right turn to proceed toward Damascus. This replaced the previous course of simply continuing on Old State Route 91 and bearing to the right with no stop.

The proof is undisputed that following reports of motorists' proceeding through existing signage without a stop and an accident occurring at the subject intersection in October 2009, the State added signage to the roadway prior to the intersection to warn motorists of this junction. The original thirty-inch by thirty-inch "stop ahead" and stop signs were replaced with larger thirty-six-inch by thirty-six-inch signs. In addition, thirty-six-inch by thirty-six-inch "stop ahead" and stop signs were added to the left side of the road. A junction sign for State Route 91 was placed before the intersection, as was a directional sign with an arrow pointing toward Damascus. Finally, a horizontal two-headed arrow sign was placed across the road from the intersection, alerting motorists that they would be required to turn either left or right. In total, the intersection contained eight signs plus the stop bar on the pavement; six additional signs were added and the existing "stop ahead" and stop signs were replaced with larger ones.

12

Regarding the number of prior accidents or incidents following the placement of these additional signs almost two months before the accident, only one witness testified that she drove through the intersection without observing the signs. A citation was issued to another motorist during that time, but no proof was presented regarding whether the driver failed to see the signs or instead observed the signs and simply chose to disregard them. With regard to Ms. Church's fatal accident, the evidence does not establish whether Ms. Church was driving observantly yet failed to see the signs.

Furthermore, concerning the expert testimony presented, Mr. Vatter, a civil engineer and Regional Traffic Engineer for TDOT, opined that the signs located along the roadway were more than sufficient to warn motorists of the impending intersection and change in the course of the road. According to Mr. Vatter, the signage placed exceeded the standards set forth in the MUTCD and provided motorists with ample time to react. Mr. Vatter further opined that the State had not breached any standard of care with regard to this intersection, stating that there were no standards requiring the installation of rumble strips or flashing lights.

In contrast, Mr. Sissom opined that the signage employed was inadequate, stating that rumble strips or flashing lights should have been added to create greater driver awareness. Mr. Sissom acknowledged, however, that there were no studies or standards regarding the use of rumble strips or flashing lights at roadway intersections. Mr. Sissom further admitted that he had never prepared a traffic signage plan and was unfamiliar with the engineering judgment involved in determining the type or location of signs to be placed along the roadway. Mr. Sissom agreed that such decisions constituted "engineering judgment call[s]." Furthermore, Mr. Sissom acknowledged that an accident could happen even with proper traffic controls in place, with the cause of this accident being driver error.

Following his review of relevant information, Mr. Sissom calculated that Ms. Church's vehicle, if traveling at the speed limit of 45 miles per hour, would have required a stopping distance of 240 feet. Mr. Sissom admitted that the existing "stop ahead" signs were placed 320 feet from the stop signs. He opined that these signs were located too far away because the stop sign could not be seen from the "stop ahead" sign due to the curvature of the road. The photographs introduced into evidence, however, belie Mr. Sissom's representation. Mr. Vatter testified that a driver would have 900 feet of sight distance when approaching this intersection from the south. The photos presented by Mr. Vatter demonstrate that the "stop ahead" signs, the stop signs, and the horizontal double arrow sign could be observed from the point at which the Junction 91 sign is located, or 670 feet from the intersection.

13

We conclude that the proof presented at trial was insufficient to support the trial court's finding that a dangerous condition existed at this intersection. The demonstrative evidence preponderated in favor of a finding that the signs erected at locations approaching the intersection were clearly visible and provided motorists ample time to react and bring their vehicles to a stop. From the time that the additional signs were installed on December 7, 2009, there were no accidents reported prior to this one. Also, only one citation was issued to a motorist who ran the stop sign during this time period. In addition, the expert testimony did not establish any breach of the standard of care by the State, as it was shown that the signage utilized exceeded the MUTCD requirements and that no requirement existed for the installation of rumble strips or flashing lights.

We also determine that the evidence preponderates against the trial court's determination that the risk involved herein was foreseeable or that notice was provided to the proper state officials at a time sufficiently prior to the injury for the State to have taken appropriate measures, as required by Tennessee Code Annotated § 9-8-307(a)(1)(J). It is helpful to compare the factual situation presented in this matter with that presented in a prior case. In *Sweeney*, our Supreme Court found that State officials had proper notice and that the accident was foreseeable due in part to the high number of prior incidents at the situs. *See* 768 S.W.2d at 258. The High Court concluded that "the erection of a two-foot by four-foot horizontal arrow behind the guardrail, at the entrance to the curve, about three weeks before plaintiff's accident" had "added no warning of any significance," so as to render evidence regarding prior incidents at the site irrelevant. *Id.* at 255. In contrast, the signage added to the subject intersection in December 2009 did provide significant additional warning to motorists. *See* 768 S.W.2d at 255. The State replaced existing signs with larger signs and employed six additional signs for drivers both approaching and at the intersection. The photographic evidence illustrates that, as Mr. Vatter explained, there was ample warning provided to motorists of the intersection from as far as 670 feet away.

As to notice, only one citation was issued to a motorist who disregarded the stop sign in the intervening period between the erection of the additional signs and the subject accident. We determine that the issuance of one citation was insufficient to cause the State to foresee the probability of this accident's occurrence. We therefore reverse the trial court's judgment awarding damages to Plaintiffs based on a dangerous condition on the roadway. Furthermore, based upon our determination that the State was not at fault, we need not address the other issues presented regarding the trial court's allocation of fault and amount of damages awarded because they are moot.

## V.  Claim of Negligent Design

Ms. Carlson's brief raises an additional issue regarding whether the State's original road design, which designated the use of a "T" intersection rather than a merge lane, was negligent.  Ms. Carlson argues that the trial court should have additionally found that the design of the intersection was flawed, as was pled in her original complaint.  The trial court made no such determination.  As the State points out, the testimony of Mr. Vatter was the only testimony elicited regarding the design of the intersection.  Mr. Vatter opined that the "T" intersection was the preferred type of intersection to construct in this situation because it provided drivers the best line of sight.  Mr. Vatter's testimony in this regard was unrefuted.  Therefore, we determine that the trial court did not err in declining to find that the design of the intersection was negligent.

## VI.  Conclusion

For the reasons stated above, we reverse the trial court's judgment in favor of Plaintiffs.  We remand this case to the trial court for collection of costs assessed below.  Costs on appeal are taxed one-half to appellee, Sherry Carlson, individually and as administratrix of the Estate of Patricia Ann Lunsford, and one-half to appellees, Mark Thomas Church, as Executor of the Estate of Jean Ellen Church, and Mark Thomas Church, Marion Carson Church, Rebecca Church Wallace, Pamela Jean Church, Mary Ann Serrano, and Patty Lou McCloud, individually.


_____

THOMAS R. FRIERSON, II, JUDGE

15